UNITED STATES *v.* STATE TAX COMMISSION
OF MISSISSIPPI ET AL.

No. 72–350. Argued March 19, 1973—Decided June 4, 1973

MARSHALL, J., delivered the opinion of the Court, in which
BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, and
POWELL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which
REHNQUIST, J., joined, *post,* p. 381.

*Jewell S. Lafontant* argued the cause for the United
States. On the brief were *Solicitor General Griswold,*

*Assistant Attorney General Wood, Mark L. Evans, Robert E. Kopp,* and *Anthony J. Steinmeyer.*

*Robert L. Wright* argued the cause for appellees. With him on the brief was *Guy N. Rogers,* Assistant Attorney General of Mississippi.

Mr. JUSTICE MARSHALL delivered the opinion of the Court.

In this case we are called upon to review the judgment of the District Court for the Southern District of Mississippi that the State of Mississippi may require out-of-state liquor distillers and suppliers to collect and remit to the State a wholesale markup on liquor sold to officers' clubs, ship's stores, and post exchanges located on various military bases over which the United States exercises either exclusive jurisdiction or jurisdiction concurrent with the State.

Prior to 1966, the State of Mississippi prohibited the sale or possession of alcoholic beverages within its borders. In that year, Mississippi passed a local option alcoholic beverage control law subject to the requirement that the State Tax Commission be the sole importer and wholesaler of alcoholic beverages distributed within the State.[1] The Tax Commission was given exclusive authority to act as wholesale distributor in the sale of alcoholic beverages to licensed retailers within the State "including, at the discretion of the Commission, any retail distributors operating within any military post . . . within the boundaries of the State, . . . exercising such control over the distribution of alcoholic beverages as [seems] right and proper in keeping with the provisions and purposes of this act."[2] In conjunction with these transactions with retailers, the Commission was directed to

---

[1] Miss. Code Ann. § 10265-01 *et seq.* (Supp. 1972).

[2] *Id.,* § 10265-18 (c).

"add to the cost of all alcoholic beverages such . . . markups as in its discretion will be adequate to cover the cost of operation of the State wholesale liquor business, yield a reasonable profit, and be competitive with liquor prices in neighboring states." [3] Under the authority granted to it by the Act, the Tax Commission promulgated Regulation 25 [4] which gives military post exchanges, ship's stores, and officers' clubs the option of purchasing liquor either from the Commission or directly from the distiller. However, insofar as purchases are made directly from the distillers by such military facilities, the regulation requires the distiller to collect and remit to the Tax Commission the latter's "usual wholesale markup." During the period involved in this case, the Tax Commission's wholesale markup was 17% on distilled spirits and 20% on wine.

Four United States military bases are located in the State of Mississippi—Keesler Air Force Base, the Naval Construction Battalion Center, Columbus Air Force Base, and Meridian Naval Air Station. Prior to 1966, the officers' clubs, the post exchanges, and the ship's stores—

[3] *Id.*, § 10265–106.

[4] The Regulation, which was originally numbered 22, reads as follows:

"Post exchanges, ship stores, and officers' clubs located on military reservations and operated by military personnel (including those operated by the National Guard) shall have the option of ordering alcoholic beverages direct from the distiller or from the Alcoholic Beverage Control Division of the State Tax Commission. In the event an order is placed by such organization directly with a distiller, a copy of such order shall be immediately mailed to the Alcoholic Beverage Control Division of the State Tax Commission.

"All orders of such organizations shall bear the usual wholesale markup in price but shall be exempt from all state taxes. The price of such beverages shall be paid by such organizations directly to the distiller, which shall in turn remit the wholesale markup to the Alcoholic Beverage Control Division of the State Tax Commission monthly covering shipments made for the previous month."

which are run with funds derived from operations rather than from funds appropriated by the United States—on these four bases had purchased liquor from distillers and suppliers located outside the State of Mississippi. Following the passage of the Mississippi local option law, these nonappropriated fund activities elected to continue the practice of purchasing liquor supplies outside the State rather than to purchase liquor from the Commission. Efforts were made by military authorities to convince the Commission not to collect the markup on out-of-state liquor purchases by nonappropriated fund activities, but these efforts failed, and the Commission compelled out-of-state distillers and suppliers to collect and remit the markup on military sales under threat of criminal prosecution and of delisting, that is, withdrawal of the privilege of selling to the Commission for retailing within Mississippi.[5] The military authorities sought to pay the markup into an escrow fund pending judicial determination of the legality of the markup as applied to military purchases. But the Commission refused to accept such an arrangement, and in order to obtain liquor supplies the nonappropriated fund activities have had to pay the markup to the distillers and suppliers, albeit under protest.[6]

In November 1969, the United States brought this action seeking declaratory and injunctive relief against the continued enforcement of Regulation 25, plus a judgment in the total amount paid to the Commission, through the suppliers, since the imposition of the markup on military purchases. The complaint alleged that the United States has exclusive jurisdiction over Keesler Air Force Base and the Naval Construction Battalion Center, and that Mississippi and the United States exercise concur-

[5] See Stipulation of Facts (hereinafter Stipulation) App. 36–38.

[6] Out-of-state suppliers had been paid $648,421.92 under protest for such markups by July 31, 1971.

rent jurisdiction over Columbus Air Force Base and Meridian Naval Air Station. The complaint contended that the Regulation was invalid because it constituted an attempt by the State to legislate with respect to military facilities and territory over which the Congress has exclusive legislative authority;[7] to impose a tax on federal instrumentalities and thereby infringe upon the Federal Government's immunity from state taxation;[8] and to interfere with federal procurement regulations and policy established by the Secretary of Defense pursuant to authority granted to him by Congress.[9] The complaint also asked that a three-judge court be convened.

On cross-motions for summary judgment, the District Court ruled in favor of the Commission, upholding the validity of the challenged Regulation. 340 F. Supp. 903 (SD Miss. 1972). The District Court agreed that the United States had exclusive jurisdiction over two of the four bases and concurrent jurisdiction over the remaining two. But it concluded that Congress' constitutional powers over the military forces and over territory belonging to the United States "are diminished by the express prohibition of the XXI Amendment as to all packaged liquor transactions which (1) are made on exclusively federal enclaves but without restriction upon use and consumption of such liquors outside the base, or (2) take place on military installations over which the state and federal government exercise concurrent jurisdiction." *Id.,* at 904. In light of this conclusion the District Court found it unnecessary to consider the import of the procurement regulations issued by the Secretary of Defense. Nor did it discuss the contention that the markup con-

---

[7] See U. S. Const., Art. I, § 8, cls. 14 and 17, Art. IV, § 3.

[8] See, *e. g., M'Culloch* v. *Maryland,* 4 Wheat. 316 (1819).

[9] See 32 CFR § 261.4 (c).

stituted an impermissible tax upon federal instrumentalities. On appeal by the United States, we noted probable jurisdiction, 409 U. S. 1005 (1972).[10] For the reasons which follow, we now hold that the District Court erred in concluding that the Twenty-first Amendment provides the State with sufficient authority over liquor transactions to support the application of the Regulation to the two bases over which the United States exercises exclusive jurisdiction,[11] and we vacate and remand the case to the District Court for consideration of further arguments, relevant to the nonappropriated fund activities on all four bases, that it did not reach.

---

[10] See *Paul* v. *United States*, 371 U. S. 245, 249–250 (1963).

[11] In a special concurring opinion, Judge Cox added that recoupment of the sums paid under the markup was also barred because, in his view, the payments had been voluntarily made by the nonappropriated fund activities. 340 F. Supp., at 909. It is true that where voluntary payment is knowingly made pursuant to an illegal demand, recovery of that payment may be denied. See, *e. g.*, *United States* v. *New York & Cuba Mail S. S. Co.*, 200 U. S. 488, 493–494 (1906); *Little* v. *Bowers*, 134 U. S. 547, 554 (1890); *Railroad Co.* v. *Commissioners*, 98 U. S. 541, 543–544 (1879). But no such voluntary payments are involved here. The Tax Commission refused to accept an escrow arrangement and it made clear to the out-of-state suppliers that severe sanctions would be applied to anyone who failed to charge the markup and to remit the resulting funds to it. Thus, the Tax Commission gave the nonappropriated fund activities no choice except to pay the markup—either to itself or to the out-of-state suppliers—in order to obtain liquor supplies or else to cease dispensing alcoholic beverages altogether—that is, to discontinue an entire line of business. Obviously, this was no choice at all. The payments of the markup were obtained only by coercion; they were paid under protest; and thus they hardly can be said to have been voluntary. See, *e. g.*, *Ward* v. *Board of County Comm'rs of Love County*, 253 U. S. 17, 23 (1920); *Atchison, T. & S. F. R. Co.* v. *O'Connor*, 223 U. S. 280, 286–287 (1912); *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320, 329 (1909); *Swift Co.* v. *United States*, 111 U. S. 22, 28–29 (1884).

# I

A. With respect to the two bases over which it claims exclusive jurisdiction, Keesler Air Force Base and the Naval Construction Battalion Center, the Government places principal reliance upon Art. I, § 8, cl. 17, of the Constitution. That clause empowers Congress to "exercise exclusive Legislation . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

In *Pacific Coast Dairy, Inc.* v. *Dept. of Agriculture,* 318 U. S. 285 (1943), the Court considered that clause sufficient to render ineffective an attempt by the State of California to fix the prices at which California milk producers could sell milk to military authorities at Moffett Field, over which the United States exercised exclusive jurisdiction.

"When the federal government acquired the tract [upon which Moffett Field was located], local law not inconsistent with federal policy remained in force until altered by national legislation. The state statute involved was adopted long after the transfer of sovereignty and was without force in the enclave. It follows that contracts to sell and sales consummated within the enclave cannot be regulated by the California law. To hold otherwise would be to affirm that California may ignore the Constitutional provision that 'This Constitution, and the laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land; . . .' It would be a denial of the federal power 'to exercise exclusive Legislation.' As respects such federal territory Congress has the com-

bined powers of a general and a state government." *Id.*, at 294 (footnotes omitted).

The view of Art. I, § 8, cl. 17, expressed in *Pacific Coast Dairy* was reaffirmed in *Paul* v. *United States,* 371 U. S. 245, 263–270 (1963). There the Court was confronted with another attempt by California to enforce minimum wholesale price regulations on sales of milk to the United States at three other military installations located within the State. A portion of the milk was purchased—as are the liquor supplies here at issue—with nonappropriated funds for use at officers' clubs and for resale at post exchanges. As to these nonappropriated fund purchases, the Court found it necessary to remand the case to determine whether the state regulatory scheme predated the transfer of sovereignty over any of the particular bases to the United States,[12] and, even if not, whether the United States in fact exercised exclusive jurisdiction over the areas in which purchases and sales of milk were made. But in so doing the Court emphasized that "[t]he cases make clear that the grant of 'exclusive' legislative power to Congress over enclaves that meet the requirements of Art. I, § 8, cl. 17, by its own weight, bars state regulation without specific congressional action." *Id.*, at 263.

Were it not for the fact that we deal here with a State's

---

[12] "The Constitution does not command that every vestige of the laws of the former sovereignty must vanish. On the contrary its language has long been interpreted so as to permit the continuance until abrogated of those rules existing at the time of the surrender of sovereignty which govern the rights of the occupants of the territory transferred. This assures that no area however small will be without a developed legal system for private rights." *James Stewart & Co.* v. *Sadrakula,* 309 U. S. 94, 99–100 (1940).

See also *Pacific Coast Dairy, Inc.* v. *Dept. of Agriculture,* 318 U. S. 285, 294 (1943); *Murray* v. *Joe Gerrick & Co.,* 291 U. S. 315, 318 (1934); *Chicago, R. I. & P. R. Co.* v. *McGlinn,* 114 U. S. 542, 546–547 (1885).

attempt to regulate and derive income from wholesale transactions in liquor—a fact which raises further questions as to the extent of the power conferred upon the States under the Twenty-first Amendment and the possibility of consent by the United States to state taxation—*Pacific Coast Dairy* and *Paul* would seem to be sufficient to dispose of this case insofar as Keesler Air Force Base and the Naval Construction Battalion Center are concerned. See also *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 140 (1937); *Standard Oil Co.* v. *California,* 291 U. S. 242 (1934). The transactions here at issue are strictly between the United States and out-of-state distillers and suppliers. The goods are ordered by the officers' clubs and other nonappropriated fund activities and then delivered within the military bases over which the United States claims exclusive jurisdiction. Thus, with respect to the initial sale and delivery of the liquor by the suppliers to military facilities located in exclusively federal enclaves, nothing occurs within the State that gives it jurisdiction to regulate the initial wholesale transaction.[13] Cf. *Polar Ice Cream & Creamery Co.* v. *Andrews,* 375 U. S. 361, 382–383 (1964); *Penn Dairies, Inc.* v. *Milk Control Comm'n,* 318 U. S. 261 (1943).

There can be no question that the tracts of land upon which Keesler Air Force Base and the Naval Construction Battalion Center are located were "purchased by the Consent of the Legislature" of Mississippi within the meaning of Art. I, § 8, cl. 17. Despite its ultimate resolution of the case, the District Court acknowledged that the United States had acquired exclusive jurisdiction over these two bases. 340 F. Supp., at 904, 906. The Federal Government acquired the relevant lands by condemnation

---

[13] The State's power to regulate transportation of alcoholic beverages through its territory to the bases or from the bases back into its jurisdiction is, however, a different question, see *infra,* at 377–378.

between 1941 and 1950.[14] And, throughout the period of acquisition, the State had expressly given its "consent . . . , in accordance with the 17th clause, 8th section, and of the 1st article of the Constitution of the United States, to the acquisition by the United States, by purchase, condemnation or otherwise, of any land in this state . . . for custom houses, post offices, or other public buildings," [15] subject only to the right of the State to serve civil and criminal process upon such public lands.[16] True, the assent of the United States to the exercise of exclusive jurisdiction over the lands occupied by the two bases was a necessary final step in light of 40 U. S. C. § 255,[17] but such assent was given through a

---

[14] See Stipulation, App. 28–29, and Ex. 1–7. It is well established that land which the Government acquires by condemnation has been "purchased" within the meaning of Clause 17. See *Paul* v. *United States,* 371 U. S., at 264; *Humble Pipe Line Co.* v. *Waggonner,* 376 U. S. 369, 371–372 (1964).

[15] Miss. Code Ann. § 4153. General consent statutes are not uncommon, see *Paul* v. *United States, supra,* at 265 and n. 31; *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 143 and n. 4 (1937), and they are as effective for purposes of Art. I, § 8, cl. 17, as consent to each particular acquisition, see *Paul* v. *United States, supra,* at 268–269.

[16] See Miss. Code Ann. § 4154. The effectiveness of such qualifications to consent has long been accepted, see, *e. g., Paul* v. *United States, supra,* at 264–265; *James* v. *Dravo Contracting Co., supra,* at 146–149.

[17] Section 255 provides in relevant part:

"Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests as he

series of letters from Government officials to the Governors of Mississippi between 1942 and 1950.[18]

Accordingly, unless the fact that in this case the State has attempted to derive revenue from private wholesale liquor transactions provides a decisive distinction, our prior cases make it clear that the Tax Commission could not attach its markup to the sale and delivery of liquor by out-of-state suppliers to nonappropriated fund activities within Keesler Air Force Base and the Naval Construction Battalion Center.

B. But the Tax Commission contends—as the District Court held—that the application of the markup regulation to the two bases over which the United States exercises exclusive jurisdiction is sustainable on the basis of the broad regulatory authority conferred upon the States by the Twenty-first Amendment. The second section of the Twenty-first Amendment provides:

> "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

In *Collins* v. *Yosemite Park & Curry Co.*, 304 U. S. 518 (1938), a concessionaire which operated hotels, camps,

---

may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."

[18] See Stipulation, App. 28–29, and Ex. 1–7.

Since the challenged regulation first became effective in 1966, long after the United States had acquired jurisdiction over the bases, there is no question here as to the application within a federal enclave of a state law that predates the transfer of sovereign authority, see n. 12, *supra*.

and stores in Yosemite National Park, under a contract with the Secretary of the Interior, sought to enjoin the efforts of California authorities to enforce the State's Alcoholic Beverage Control Act within the limits of the Park. The state liquor law would have required the concessionaire to apply for permits for the importation and sale of liquor and to pay related taxes and fees. The Court found that the State had ceded to the United States, and that the United States had accepted, exclusive jurisdiction over Yosemite National Park, except insofar as the State had expressly reserved the right to tax persons and corporations within the Park. *Id.*, at 527–530. In light of this determination, the Court held that "[a]s there is no reservation of the right to control the sale or use of alcoholic beverages, such regulatory provisions as are found in the Act"—namely, the provisions concerning importation and sales permits—"are unenforceable in the Park." *Id.*, at 530. In support of its attempt to apply the permit provisions within the Park, the State placed specific reliance upon the regulatory authority conferred upon it by § 2 of the Twenty-first Amendment. But the Court rejected this argument, agreeing instead with the District Court's conclusion "that though the Amendment may have increased 'the state's power to deal with the problem . . . [of liquor importation], it did not increase its jurisdiction.'" *Id.*, at 538. The Court then went on to state:

> "As territorial jurisdiction over the Park was in the United States, the State could not legislate for the area merely on account of the XXI Amendment. There was no transportation into California 'for delivery or use therein.' The delivery and use is in the Park, and under a distinct sovereignty. Where exclusive jurisdiction is in the United States, without power in the State to regulate alcoholic beverages,

the XXI Amendment is not applicable." *Ibid.* (Footnotes omitted.)

It is true, as the Tax Commission argues, that the Court did sustain the application of the tax provisions of the state liquor law within the Park. But this aspect of the decision was bottomed specifically on the State's reservation of taxing authority in its cession of lands to the United States, *id.,* at 532, 536.

*Collins* would seem to compel the conclusion that absent an appropriate express reservation—which is lacking here—the Twenty-first Amendment confers no power on a State to regulate—whether by licensing, taxation, or otherwise—the importation of distilled spirits into territory over which the United States exercises exclusive jurisdiction. See also *Johnson* v. *Yellow Cab Transit Co.,* 321 U. S. 383 (1944). Certainly, the Amendment was intended to free the State of "traditional Commerce Clause limitations when it restricts the importation of intoxicants destined for use, distribution, or consumption within its borders." *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.,* 377 U. S. 324, 330 (1964). See also *Joseph E. Seagram & Sons, Inc.* v. *Hostetter,* 384 U. S. 35, 42 (1966). But the Government contends that here, as in *Collins,* there was no "transportation or importation [of liquor] into [the] State . . . for delivery or use therein" within the meaning of the second section and therefore the Twenty-first Amendment does not assist the Tax Commission's case. We agree.

The District Court acknowledged that Keesler Air Force Base and the Naval Construction Battalion Center "are to Mississippi as the territory of one of her sister states or a foreign land. They constitute federal islands which no longer constitute any part of Mississippi nor function under its control." 340 F. Supp., at 906. And it recognized that in light of *Collins,* "[t]he importation

of property onto these bases for use thereon would clearly be outside the ambit of the XXI Amendment." *Id.,* at 906–907. But the court considered *Collins* to be limited strictly to the situation in which delivery and use of the liquor was restricted to the exclusive enclave, whereas in this case "[t]he undisputed facts show that it was acquired for the purpose of being sold to individuals for their use and consumption either on the base or in the surrounding state." *Id.,* at 907. Such off-base consumption was sufficient, in the District Court's view, to subject the transactions between the out-of-state suppliers and the nonappropriated fund activities to the regulatory authority granted to Mississippi under the Twenty-first Amendment. We think, however, that the District Court unjustifiably narrowed the decision in *Collins.*

There is, in fact, no indication in *Collins* that the liquor purchased from the concessionaire's facilities in the Park was always consumed within the limits of the Park. To the contrary, the complaint in that case specifically stated that the liquor imported for sale in the park facilities was sold "for consumption on or off the premises where sold." [19] Hence, it is just as reasonable to assume that some of the liquor sold in the Park was consumed outside its limits in the State of California as it is to assume that some of the liquor sold on these two bases was ultimately consumed in the State of Mississippi.[20] The

---

[19] Transcript of Record, No. 870, O. T. 1937, p. 3.

[20] In fact, the record in this case contains no express indication as to the extent to which packaged liquor purchased from the nonappropriated fund activities is consumed outside the jurisdiction of the two bases. The District Court inferred off-base consumption from the facts that "numerous classes of non military persons are authorized to make purchases; and every selling facility exacts a promise from each purchaser that he will obey the laws of the state as to such of the liquor bought as may be taken off of the installation." 340 F. Supp., at 905. By a parity of reasoning the likelihood that some of the liquor purchased from stores located in Yosemite National

*Collins* Court, in rejecting California's reliance upon the Twenty-first Amendment, pointed, to be sure, to the fact that "delivery and use" of the liquor was "in the Park," 304 U. S., at 538. But, considered in the context of the case, the Court's reference clearly was to the transaction between the out-of-state suppliers and the park concessionaire. It was that transaction which California sought to regulate, and insofar as that transaction was concerned, the delivery and use—that is, the delivery, storage, and sale—of the liquor occurred exclusively within the Park. The particular transactions at issue in this case between out-of-state suppliers and the military facilities stand on no different footing, and thus, given that the State has retained only the right to serve process on the two bases, *Collins* is dispositive of the Commission's effort to invoke the State's authority under the second section of the Twenty-first Amendment to impose its markup on these transactions.

This is not to suggest that the State is without authority either to regulate liquor shipments destined for the bases while such shipments are passing through Mississippi or to regulate the transportation of liquor off the bases and into Mississippi for consumption there. Thus, while it may be true that the mere "shipment [of liquor] through a state is not transportation or importation into the state within the meaning of the [Twenty-first] Amendment," *Carter* v. *Virginia,* 321 U. S. 131, 137 (1944), a State may, in the absence of conflicting federal regulation, properly exercise its police powers to regulate and control such shipments during their passage through its territory insofar as necessary to prevent the "unlawful diversion" of liquor "into the internal commerce of the State," see *Hostetter* v. *Idlewild Bon Voyage Liquor*

---

Park was transported to and consumed in California is even greater since those stores were open to the public at large.

*Corp.,* 377 U. S., at 333, 331 n. 10; *Carter* v. *Virginia, supra; Duckworth* v. *Arkansas,* 314 U. S. 390 (1941). And the State, of course, remains free to regulate or restrict, under § 2 of the Twenty-first Amendment, the transportation off the two bases of liquor that has been purchased and is in fact "destined for use, distribution, or consumption" within its borders, see *Joseph E. Seagram & Sons, Inc.* v. *Hostetter,* 384 U. S., at 42; see also *California* v. *LaRue,* 409 U. S. 109, 114 (1972).

But there is no indication here that the markup is an effort to deal with problems of diversion of liquor from out-of-state shipments destined for one of the two bases. Nor need we now decide the precise parameters of the State's authority to regulate efforts to import liquor from the exclusively federal enclaves, since that question is not before us. For our purposes here, it suffices to note that any legitimate state interest in regulating the importation into Mississippi of liquor purchased on the bases by individuals cannot effect an extension of the State's territorial jurisdiction so as to permit it to regulate the distinct transactions between the suppliers and the nonappropriated fund activities that involve only the importation of liquor into the federal enclaves which "are to Mississippi as the territory of one of her sister states or a foreign land," 340 F. Supp., at 906. To conclude otherwise would be to give an unintended scope to a provision designed only to augment the powers of the States to regulate the importation of liquor destined for use, distribution, or consumption in its own territory, not to " 'increase its jurisdiction,' " *Collins* v. *Yosemite Park & Curry Co.,* 304 U. S., at 538.

C. Before this Court the Tax Commission also asserts that the markup might properly be viewed as a sales tax and that the United States has consented to the imposition of such a "tax" in the context of the two exclusive jurisdiction bases under the Buck Act of 1940,

54 Stat. 1059, now 4 U. S. C. §§ 105–110. Section 105 (a) of that Act provides in part:

"No person shall be relieved from liability for payment of, collection of, or accounting for any sales or use tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, on the ground that the sale or use, with respect to which such tax is levied, occurred in whole or in part within a Federal Area . . . ." 4 U. S. C. § 105 (a).

However, § 107 (a) of the Act spells out certain exceptions to the consent provision contained in § 105 (a). Specifically, § 107 (a) states that § 105 (a) "shall not be deemed to authorize the levy or collection of any tax on or from the United States or any instrumentality thereof . . . ." Whether the markup should be treated as a tax on sales occurring within a federal area within the meaning of § 105 (a), see also 4 U. S. C. § 110 (b), and, if so, whether the exception contained in § 107 (a) nevertheless serves to remove the markup from the consent provision for purposes of the two exclusively federal enclaves are issues which the record reveals were never considered, much less decided, by the District Court. Having found that the District Court erred in the basis on which it did dispose of this case, we think that these additional issues are appropriately left for determination by that court in the first instance on remand.

## II

The two bases over which the United States claims to exercise jurisdiction concurrent with the State—Columbus Air Force Base and Meridian Naval Air Station—present somewhat different problems. Since the United States has not acquired exclusive jurisdiction over the land upon which these bases are located, the Government

is unable to rest its claims for immunity from the markup with respect to purchases of liquor for the nonappropriated fund activities of these bases on Art. I, § 8, cl. 17. Rather, it bases its argument on the theories that the markup either is an unconstitutional tax upon instrumentalities of the United States [21] or is invalid under the Supremacy Clause because it conflicts with federal procurement regulations and policy.[22] The District Court specifically found it unnecessary to reach the Government's argument under the Supremacy Clause, and implicitly declined to reach the Government's argument concerning taxation of United States instrumentalities. Instead, having concluded that, despite Art. I, § 8, cl. 17, the Twenty-first Amendment permitted the Tax Commission to apply the markup to out-of-state purchases destined for nonappropriated fund activities on the two bases over which the United States exercises exclusive jurisdiction, the District Court simply reasoned that "[a] fortiori, the liquor sales made on the two bases over which the federal and state governments exercise concurrent jurisdiction—Meridian and Columbus—are similarly subject to Mississippi law." 340 F. Supp., at 907.

The District Court's rationale for adopting this view is not entirely clear. Certainly it was correct when it further observed that "as to the concurrent jurisdiction bases, the liquor sales transactions occurred within the jurisdiction of the State of Mississippi, even where the consumption or other use of the liquor was consummated within the territorial confines of the base." *Ibid.* But this serves only to dispose of any question under Art. I, § 8, cl. 17. As already noted, however, the Government does not purport to rest its case with respect to transac-

---

[21] See, *e. g., M'Culloch* v. *Maryland,* 4 Wheat. 316 (1819).

[22] See 32 CFR § 261.4 (c). See also *Paul* v. *United States,* 371 U. S., at 253.

tions involving the two bases over which it exercises only concurrent jurisdiction upon that clause. In any event, we have now concluded that the District Court erred in ruling that the Twenty-first Amendment empowered the State Tax Commission to apply the markup to transactions between out-of-state distillers and nonappropriated fund activities located on the two exclusively federal enclaves. Our conclusion eliminates the essential premise of the District Court's decision concerning the two concurrent jurisdiction bases. While the arguments upon which the Government does rely with respect to the purchase of liquor destined for those two bases present, to be sure, only questions of law which we might now decide, we believe it would be useful to have the views of the District Court on these additional arguments, and we therefore remand the case to the District Court to allow it to consider initially the Government's instrumentality and Supremacy Clause arguments. Cf. *Lewis* v. *Martin,* 397 U. S. 552, 560 (1970); *FCC* v. *WJR,* 337 U. S. 265, 285 (1949).

The judgment of the District Court is vacated and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE REHNQUIST concurs, dissenting.

This is an amazing decision doing irreparable harm to the cause of States' rights under the Twenty-first Amendment. That Amendment gives the States pervasive control over the "transportation . . . into [the] State . . . for delivery or use therein of intoxicating liquors, in violation" of its laws. The liquors cannot reach these federal enclaves unless they are transported into or across the State and they are obviously delivered and used within Mississippi.

Two of the posts are inland enclaves within the State. Two are on Mississippi's coastline. But to reach the latter by water a vessel must enter Mississippi's territorial waters. As we held in *Skiriotes* v. *Florida,* 313 U. S. 69, the territorial waters are part of the domain over which the coastal State has sovereignty. These shipments therefore constitute "transportation or importation into" Mississippi for "delivery . . . therein of intoxicating liquors" within the meaning of the Twenty-first Amendment. The power of the State to bar the transportation of liquor into the State certainly includes the power to manage its distribution within the State. Mississippi has done no more than that. So it seems clear to me that this is a classic example of the exercise of basic States' rights under the Twenty-first Amendment.

Mississippi in her regulation of alcoholic beverages is a so-called monopoly State,[1] like 17 other States. Some of these monopoly States make themselves the exclusive wholesaler[2] of liquor and wine and exclusive retailer as well. Mississippi only makes itself the exclusive wholesaler. The sales involved in this litigation are wholesale sales to clubs of members of the Armed Services on four federal bases in Mississippi, over two of which Mississippi and the United States have concurrent jurisdiction, the United States having exclusive jurisdiction over the other two.

Under Mississippi law these post exchanges and other facilities (hereafter post exchanges) may order liquor direct from the distiller or from the state commission. The Mississippi regulation provides, "All orders of such organizations shall bear the usual wholesale

---

[1] Miss. Code Ann. § 10265-01 *et seq.* (Supp. 1972).

[2] Wholesaler is defined as "any person, other than a manufacturer, engaged in distributing or selling any alcoholic beverage at wholesale for delivery within or without this State when such sale is for the purpose of resale by the purchaser." *Id.,* § 10265-05 (g).

markup [3] in price but shall be exempt from all state taxes." The wholesale markup on distilled spirits is 17% and on wine, 20%. If the purchase is made from the distiller, it remits the wholesale markup to the State. A distiller who fails or refuses to observe these conditions is deprived of the benefits of this state law and may be prosecuted.

This suit brought before a three-judge district court was to collect the amount of the markups paid by the post exchanges and to enjoin the enforcement of the Mississippi regulation against distillers or suppliers doing business with the post exchanges on the terms of Mississippi law. The three-judge District Court, relying on the Twenty-first Amendment,[4] gave appellees a summary judgment, 340 F. Supp. 903. Its judgment should be affirmed.

The four federal enclaves involved in this dispute are in the State of Mississippi. The spirits are made out of State and delivered to the post exchanges within the State. The question is whether the terms of the Twenty-first Amendment are met, that is to say, whether there is "transportation . . . into . . . [the] State . . . for delivery or use therein of intoxicating liquors."

The spirits are not all consumed on or at the post exchanges. Rather, they are resold to members of the Armed Services, to retired members and the families of members; and some of the spirits are consumed in Mississippi and outside the federal enclaves by guests of

---

[3] The Act provides in § 10265-106, "The Commission shall add to the cost of all alcoholic beverages such various markups as in its discretion will be adequate to cover the cost of operation of the State wholesale liquor business, yield a reasonable profit, and be competitive with liquor prices in neighboring states."

[4] It provides in § 2, "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the law thereof, is hereby prohibited."

members and retirees and their families. As the District Court said, the spirits are not brought into the federal enclaves for sole use there. The spirits are resold to individuals for their use or consumption either on the federal enclave or in the surrounding state area.

Private retailers in Mississippi pay the State a tax of $2.50 a gallon on distilled spirits. The Post Exchanges pay no state tax on their resales; and it is stipulated that these post exchanges each make a profit.

Section 6 of the Universal Military Training and Service Act, as amended in 1951, authorizes the Secretary of Defense to make regulations "governing the sale, consumption, possession of or traffic in . . . intoxicating liquors to or by members" of the Armed Forces "at or near any camp, station, post, or other place primarily occupied by [them]." 50 U. S. C. App. § 473. And it makes criminal, knowing violations of such regulations. Department of Defense Directive 1330.15 issued May 4, 1964, and amended June 9, 1966, provides that "the purchase of all alcoholic beverages for resale at any camp, post, station, base or other place primarily occupied by members of the Armed Forces within the United States shall be in such a manner and under such conditions as shall obtain for the Government the most advantageous contract, price and other factors considered." The Act and the Department of Defense regulation do not on their face purport to override or displace state price control of liquor. It is said, however, that that is immaterial.

The Solicitor General relies on Art. I, § 8, cl. 17, of the Constitution, which empowers Congress to "exercise exclusive Legislation . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." This provision, it is said, bars state price regulations as respects sales to post exchanges on the two federal enclaves

over which the United States has exclusive jurisdiction even in absence of a conflicting federal statute or regulation. Reliance is placed on *Paul* v. *United States*, 371 U. S. 245, 263–268. The *Paul* case did not involve the Twenty-first Amendment. There post exchanges resold milk and California provided minimum wholesale price regulations; and we held that Art. I, § 8, cl. 17, "by its own weight, bars state regulation without specific congressional action." *Id.*, at 263.

The Twenty-first Amendment and Art. I, § 8, cl. 17, are parts of the same Constitution. In *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.*, 377 U. S. 324, we held that while the Twenty-first Amendment gave the States control where otherwise the Commerce Clause would be a bar to its action (*id.*, at 330), the Twenty-first Amendment did not give a State the power to prohibit the passage of liquor through its territory for delivery to consumers in foreign countries. Congress had enacted a law governing traffic in liquor to foreign nations; and that aspect of the Commerce Clause gave Congress exclusive authority over foreign trade. Hence it is argued here that the power of Congress to exercise exclusive jurisdiction over a federal enclave pre-empts state power. But all that we have here is "transportation" into a State, not beyond it.

*Collins* v. *Yosemite Park & Curry Co.*, 304 U. S. 518, held as respects a *state regulatory regime* of alcoholic beverages within Yosemite National Park in California that the Twenty-first Amendment gave the State no power to supervise liquor transactions within the federal enclave. The Court said:

> "As territorial jurisdiction over the Park was in the United States, the State could not legislate for the area merely on account of the XXI Amendment. There was no transportation into California 'for delivery or use therein.' The delivery and use is

in the Park, and under a distinct sovereignty. Where exclusive jurisdiction is in the United States, without power in the State to regulate alcoholic beverages, the XXI Amendment is not applicable." *Id.*, at 538.

That observation was apt, for California undertook to assert a regulatory authority within the park. The Solicitor General presses for an application of *Collins* to the present post exchanges. Yet Mississippi asserts no regulatory power over these military bases or over the dispensing of liquor by the post exchanges. Mississippi only collects a tax from out-of-state distillers and suppliers who ship liquor to the post exchanges. Those shipments, as noted, must enter Mississippi to reach the military bases.

Moreover, Mississippi asserts no authority to collect the tax from the Federal Government or its instrumentalities, the post exchanges. The legal incidence of the so-called sales tax is on the distributor only. The economic incidence is, of course, on the post exchanges. But it has long been held that there is no constitutional barrier to that result.

That raises the other phase of the case which should be decided here, as it is covered by our decisions and requires no additional factfindings for its resolution.

At least since *Alabama* v. *King & Boozer*, 314 U. S. 1, state taxes have been upheld on those doing business with the Federal Government even as respects cost-plus contracts where the terms of the contract forced their payment out of the federal treasury.[5] The principle of

---

[5] In *New York* v. *United States*, 326 U. S. 572, in discussing the Federal Government's right to levy taxes on New York State's sale of mineral waters, the Court stated, "In the older cases, the emphasis was on immunity from taxation. The whole tendency of recent cases reveals a shift in emphasis to that of limitation upon immunity. They also indicate an awareness of the limited role of

*King & Boozer* permits no exception for distillers who make wholesale transactions with post exchanges, as the legal incidence of the tax is on the distillers, not on the

courts in assessing the relative weight of the factors upon which immunity is based." *Id.*, at 581.

That trend continued in *Esso Standard Oil Co.*, v. *Evans*, 345 U. S. 495, where the Court upheld the validity of a state privilege tax on Esso, occasioned by its storage of gasoline owned by the United States, even though it was shown that the United States had contractually obligated itself to reimburse the contractor for any state tax liability incurred. The Court distinguished those cases which had held that there could be no state tax on federally owned property by indicating that in *Esso* the tax was on the privilege of storing Government property.

*United States* v. *City of Detroit*, 355 U. S. 466, and *United States* v. *Muskegon*, 355 U. S. 484, concerned the application of a 1953 Michigan statute providing that when tax-exempt real property is used by a private person in a business conducted for profit the private person is subject to taxation to the same extent as if he were the owner of the property. Both cases involved Government contractors occupying defense plants, one under a lease and the other under a permit which could be terminated at will. The Court upheld the imposition of the tax, saying the constitutional immunity of the Federal Government from state taxation was not violated and that the state statute was not discriminatory nor was the statute discriminatorily administered. This result was reached notwithstanding the fact that the Federal Government had for years reimbursed its contractors for the costs of possessory interest taxes.

In *City of Detroit* v. *Murray Corp.*, 355 U. S. 489, the Court upheld a tax imposed on Murray, an Air Force subcontractor, on the basis of work in process and inventory, title to which was in the Federal Government on the tax day. The Court found no constitutional impediment to permitting a possessory-interest tax on Government-owned personal property. Unlike the real property situation, the Michigan statute did not specifically authorize such tax, but it was imposed pursuant to the usual personal property tax statute, levying the tax on the property. In commenting on the disparity between the statutes, the Court stated, "It is true that the particular Michigan taxing statutes involved here do not expressly state that the person in possession is taxed 'for the privilege of using or possessing' personal property, but to strike down a tax on the possessor because of such a verbal omission would only prove a victory for empty

post exchanges. Moreover, the Buck Act, 54 Stat. 1059, now 4 U. S. C. § 105 *et seq.*, authorizes the application of state sales and use taxes to all post exchange purchases where "the sale or use, with respect to which such tax is levied, occurred in whole or in part within a Federal area." The Buck Act exempts from such taxes, sales, purchases, storage, or use of personal property sold by the United States or any instrumentality thereof to "any authorized purchaser" (§ 107), who is defined as one permitted to purchase at commissaries, ship's stores, post exchanges, and the like, by regulations of the departmental Secretary.

It also does not authorize "the levy or collection of any tax on or from the United States or any instrumentality thereof." 4 U. S. C. § 107 (a).

The markup which the State requires wholesalers of liquor to make is in its worst light a sales tax. There is no "levy or collection" by the State from a post exchange in any technical, legal sense. As noted, the economic but not the legal incidence of the tax is in the post exchanges. The post exchange is merely paying indirectly the cost of doing business in the manner in which *King & Boozer* held that there was no constitutional immunity from state taxation.

That alone is sufficient to distinguish the present case from *Paul* v. *United States,* 371 U. S. 245, where state minimum price regulations were held to be inoperative as applied to purchases of milk by federal instrumentalities, such as post exchanges. *Paul* in other words involved no tax at all. The levy of Mississippi on wholesalers is, as noted, a sum designed to cover the cost to the State of operating the wholesale liquor business, yield a reasonable profit, and be competitive with liquor prices in

---

formalisms. And empty formalisms are too shadowy a basis for invalidating state tax laws. . . . In the circumstances of this case the State could obviate such grounds for invalidity by merely adding a few words to its statutes." *Id.,* at 493.

neighboring States. It is plainly, therefore, a tax on sales and in my view authorized by Congress under the Buck Act. The Solicitor General concedes in his brief that the Mississippi regulation is meant only "to raise revenue." By reason of the Buck Act it matters not, therefore, that the post exchanges, as held in *Paul,* are federal instrumentalities. Here, as in *King & Boozer,* we deal only with the "economic" burden of the local tax, its legal incidence being solely on the distributor.

*First Agricultural National Bank* v. *State Tax Comm'n,* 392 U. S. 339, is inapposite. In that case Congress had specifically provided four ways in which the States could tax national banks, apart from taxes on their real estate. *Id.,* at 341–342. Efforts to allow broader taxation were defeated in Congress. Because of that history, we read the Massachusetts sales tax closely and noting that the tax was " 'recoverable at law' " from the national bank, *id.,* at 347, held that it transcended the congressional waiver of immunity.

That case does not control here for two reasons.

First, the legal incidence of the present tax is not in the post exchanges, only the economic incidence.

Second, the Massachusetts sales tax had no relation to the Twenty-first Amendment. The present case involves "transportation or importation" of liquor into the State of Mississippi over which the State has plenary control. The State, having the power to bar liquor completely from Mississippi, can admit it on such terms and conditions as she chooses. If she sought to levy a tax on the post exchanges a different issue would arise. But there is no federal immunity against including state costs in federal contracts.

While the Buck Act by § 107 (a) bars a state tax on federal instrumentalities—which as *Paul* holds includes post exchanges—*King & Boozer* allows a state tax on those who, like the wholesalers in this case, do business with the United States. *King & Boozer,* decided in 1941,

after the Buck Act, stated the modern version of the scope of intergovernmental immunity.[6] The present case is therefore on all fours with the excise tax imposed by Florida on milk distributors who in turn sold to federal enclaves. In referring to the Buck Act we said:

"We think this provision provides ample basis for Florida to levy a tax measured by the amount of milk Polar distributes monthly, including milk sold to the United States for use on federal enclaves in Florida." *Polar Ice Cream & Creamery Co.* v. *Andrews,* 375 U. S. 361, 383.

The judgment below should be affirmed.

---

[6] During the first third of this century the doctrine of intergovernmental immunity, as it applies to state taxation of allegedly federal governmental activities, went through a highly expansive phase. Among the taxes held invalid were the following: sales tax on articles sold to the Government, *Panhandle Oil Co.* v. *Mississippi,* 277 U. S. 218; income tax on earnings from patents and copyrights, *Long* v. *Rockwood,* 277 U. S. 142; income tax on income derived by lessees of public lands, *Gillespie* v. *Oklahoma,* 257 U. S. 501.

At the same time, however, a number of inroads or qualifications on the doctrine were established. Among the taxes held valid were the following: corporate franchise tax measured by income including that from Government bonds, *Flint* v. *Stone Tracy Co.,* 220 U. S. 107; inheritance or estate tax measured in part by Government bonds, *Plummer* v. *Coler,* 178 U. S. 115; income tax on capital gain on resale of Government bonds, *Willcuts* v. *Bunn,* 282 U. S. 216; income tax on net income of contractors with the Government, *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514. This trend culminated in the decision of the Court in *Alabama* v. *King & Boozer,* 314 U. S. 1.

That trend led a commentator to note, "Today, the United States conducts much of its business through a vast number of private parties. The trend in the U. S. Supreme Court has been to reject immunizing these private parties from non-discriminatory state taxes, as a matter of constitutional law, even though the United States bears the economic brunt of the tax, indirectly in some instances, by inclusion in price, and more directly in many instances, by reimbursement to the contractor as an item of cost." Rollman, Recent Developments in Sovereign Immunity of the Federal Government from State and Local Taxes, 38 N. D. L. Rev. 26, 30.