ENGLAND, Justice.
The circuit court for the Thirteenth Judicial Circuit entered final summary judgment in favor of appellee in a declaratory action brought against the Department of Business Regulation, in which it held Section 561.14(4), Florida Statutes (1975), to be in violation of the Commerce Clause of the United States Constitution.[1] That provision of the statute required Bonanni Ship Supply, Inc. to obtain an exporter’s license from the State of Florida in order to engage in the business of importing and exporting “in-bond” merchandise for distribution and use solely in foreign commerce. Under Article V, Section 3(b)(1) of the Florida Constitution, the Department asks us to review the trial court’s declaration of invalidity. The sole issue for review is whether the state’s regulation of Bonanni’s import-export activity constitutes an unreasonable burden on interstate commerce under the federal constitution.
There is no controversy as to either the facts in this case or the applicable standard of law. Both parties agree that the Commerce Clause of the United States Constitution permits a state to exercise reasonable police powers necessary to protect local interests, and that in this case the sole interest of the state is to prevent a diversion of liquor from foreign commerce into the stream of state distribution. Both parties also agree that the federal government has entered the regulatory field with respect to Bonanni’s business, having imposed extensive procedural requirements which govern Bonanni’s activities in transferring liquor through the port of Tampa.[2]
*310 The ultimate question we are called upon to answer is whether the state’s supplementary regulations, as set forth in Chapter 561 of the Florida Statutes, constitute an unreasonable burden on interstate commerce within the limitations established by the federal courts. This state’s regulatory scheme with respect to Bonanni and like exporters consists of a $500 license fee, a $5,000 bond to protect against tax loss in the event merchandise is diverted into state commerce, monthly reports on the transfer of liquor into and out of the bonded warehouse in Tampa, and a semi-annual physical inspection of the bonded warehouse at which a customs employee must be present.[3]
Relying on Duckworth v. Arkansas, 314 U.S. 390, 62 S.Ct. 311, 86 L.Ed. 294 (1941), and Carter v. Virginia, 321 U.S. 131, 64 S.Ct. 464, 88 L.Ed. 605 (1944), the Department argues that a reasonable state regulation of foreign commerce is permissible to achieve the state’s legitimate objective of preventing diversion to in-state commerce. Bonanni contends that Duckworth and Carter are not relevant in this case because both involved state regulation in areas devoid of any federal regulatory activity, and that Epstein v. Lordi, 261 F.Supp. 921 (D.N.J.1966), aff’d, 389 U.S. 29, 88 S.Ct. 106, 19 L.Ed.2d 29 (1967), is more to the point. Epstein was a Commerce Clause case involving competing state and federal regulations.
Epstein is persuasive here, and we hold that the state’s regulatory activity is not reasonably necessary to protect against diversion. On the record here,- the federal regulatory scheme is more than adequate to detect any diversion from the importation, storage, and exportation of wholesale liquor passing through the State of Florida.
Obviously, the license fee and bonding requirement provide no protection for the state against diversion. Similarly, the filing of monthly reports offers nothing to the state which the federal government does not already have; indeed, Bonanni attaches to the state’s form each month a copy of the report it files with the federal government for the same purpose. The one state activity that has no counterpart in the federal scheme of regulation is the semi-annual physical inventory.[4] Since we can discern no information regarding diversion that might emerge from the state’s physical in *311 ventory which would not also be revealed by the paper and physical inventories provided by the federal government, we must conclude that the state’s attempt to monitor for diversion is merely duplicative of the federal effort. Under these circumstances, the federal regulatory activity and the Commerce Clause of the United States Constitution preclude state regulation.[5] Section 561.14(4), which requires exporters such as Bonanni to obtain a license and to comply with the bonding, filing, and inventory requirements we have described, violates the Commerce Clause of the United States Constitution and is invalid.
Nothing in our decision today should be construed as prohibiting the state from requiring exporters to register with the state for identification purposes.[6] A reasonable registration requirement would not, in the words of the federal constitution, interfere with congressional power “[t]o regulate Commerce with foreign Nations, and among the several States . . .
The decision of the trial court is affirmed.
OVERTON, C. J., and BOYD, SUND-BERG and HATCHETT, JJ., concur.
ADKINS and KARL, JJ., dissent.

. U.S.Const. art. I, § 8, cl. 3.

. Bonanni’s business is subject to the Tariff Act of 1930, 19 U.S.C. § 1311 et seq., the Alcoholic Beverage and Tobacco Products Provisions of the Internal Revenue Code of 1954, 26 U.S.C. § 5001 et seq., and various regulations promulgated by the Department of the Treasury for the U. S. Customs Service, 19 C.F.R. §§ 1.1— 177.11 (1977). In practice, these regulations translate into strict and pervasive controls over Bonanni’s operations, as indicated by the following descriptive excerpt from the affidavit of the Assistant District Director of the Bureau of Customs in Tampa:
“When a shipment arrives in the port of Tampa the merchandise is off-loaded from the ship into a dock storage building which is under the control of the Bureau of Customs. The merchandise may not be removed from the dock storage building until a warehouse bond is filed by the importer at the United States’ Customs House. .
After the warehouse bond is filed by the importer, authority is then given for the merchandise to be removed from the dock of arrival and is then transferred by a customs’ bonded cartman, under strict customs supervision. This customs supervision includes an inventory of what leaves the dock storage building and what is delivered to the cartman.
The imported merchandise is off-loaded from the bonded cartman to the bonded warehouse (which warehouse must meet specified con *310 struction requirements) again under strict customs’ supervision. The bonded warehouse itself is under customs’ lock and key and the importer, in this case Bonanni Ship Supply, Inc., does not have a key to the lock.
Before the importer may obtain any release of the merchandise in the bonded warehouse, certain documentation must be filed with the customs’ house and approved before withdrawal is allowed. If the documentation is approved a customs’ warehouse officer is sent to the bonded warehouse where he unlocks the warehouse premises and permits the importer to withdraw the prescribed goods from the bonded warehouse. At the time of such withdrawal, the customs’ warehouse officer accounts and verifies the actual merchandise being withdrawn against the withdrawal documentation previously filed with the customs’ house.
Upon withdrawal from the bonded warehouse, the merchandise again goes to a bonded cartman where it is transported to the ship for delivery outside the territorial limits of the United States. Again this loading process is under customs’ supervision and a receipt is always required from a responsible officer of the vessel certifying the merchandise that has been delivered.
In addition to the above supervisory controls as to the importation and exportation of liquor and bond, the Bureau of Customs also conducts an annual inventory of the importers business the results of which are cross-checked against all records previously filed with the Bureau of Customs. The annual inventory results must, of course, coincide with the documentation which has been filed through the year by the importer regarding each shipment of liquor.”

. These requirements appear specifically in Sections 561.14(4) (license), 561.37 (bond), 561.41 (inspections), and 561.55 (reports), Florida Statutes (1975). When the Department conducts its semi-annual inspections Bonanni must pay a customs officer $50.00 per day, which amount is not reimbursed by the state.

. The federal government apparently conducts an annual physical inventory against which Bo-nanni’s reports are verified. See note 2 above. The record on this point is not entirely clear, but we can assume for purposes of this issue that the annual federal inventory differs to some extent from the state’s semi-annual inventory.

. In United States v. State Tax Comm’n, 412 U.S. 363, 377, 93 S.Ct. 2183, 2192, 37 L.Ed.2d 1 (1973), the Court indicated that
“a State may, in the absence of conñicting federal regulation, properly exercise its police powers to regulate and control [liquor] shipments during their passage through its territory insofar as necessary to prevent the 'unlawful diversion’ of liquor ‘into the internal commerce of the State’ . . . (Emphasis added.)
See also Texas Liquor Control Bd. v. Ammex Warehouse Co., 384 S.W.2d 768 (Tex.App.1964), cert. denied, 382 U.S. 977, 86 S.Ct. 547, 15 L.Ed.2d 468 (1966).

. Bonanni concedes that a reasonable registration requirement is not an unreasonable burden on interstate commerce.