**UNITED STATES of America, Plaintiff,**

v.

**STATE TAX COMMISSION OF the STATE OF MISSISSIPPI et al., Defendants.**

**Civ. A. No. 4554.**

United States District Court,
S. D. Mississippi,
Jackson Division.

June 12, 1974.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., for plaintiff.

Guy N. Rogers, Asst. Atty. Gen., Taylor Carlisle, James E. Williams, State Tax Comm., Jackson, Miss., for defendants.

## OPINION

Before CLARK, Circuit Judge, RUSSELL, Chief District Judge, and COX, District Judge.

CLARK, Circuit Judge:

We are called upon to solve another of the recurring conflicts between the power to tax and the right to be free from taxation which are inevitable where two governments function at the same time and in the same territory.

In arguing the case of McCulloch v. Maryland, Luther Martin, Attorney General of Maryland, himself a member of the Constitutional Convention, said, "The whole of this subject of taxation is full of difficulties, which the Convention found it impossible to solve, in a manner entirely satisfactory. . . . This was one of the anomalies of the government, the evils of which must be endured, or mitigat-

ed by discretion and mutual forbearance." McCulloch v. Maryland, 4 Wheat. 316, 376, 4 L.Ed. 579. Where discretion and forbearance have failed it often has fallen to this Court to determine specific cases for which the Convention was unable to agree upon a general rule. Looking backward it is easy to see that the line between the taxable and the immune has been drawn by an unsteady hand.

United States v. Allegheny County, 322 U.S. 174, 175–176, 64 S.Ct. 908, 910, 88 L.Ed. 1209 (1944).

In the case at bar, the State of Mississippi and the federal government are brought into conflict through exercises of their respective sovereign power, which each claims is paramount to the other under the Constitution. More precisely, our task today is to determine whether the State's exaction of a tax on wholesale sales by independent vendors of liquor to federal military organizations violates the immunity of the United States from state taxation or impermissibly interferes with federal military procurement policy and regulations.

Under the XXI Amendment, the State of Mississippi controls the importation and sale of intoxicating liquor through an integrated statutory scheme under which the State Tax Commission is designated as the sole importer and wholesaler of alcoholic beverages, which may be distributed only to licensed retailers within the state, "including . . .

any retail distributors operating within any military post . . . within the boundaries of the state . . . ."[1] The statutory plan directs the Commission to "add to the cost of all alcoholic beverages [which it distributes to retailers] such . . . markups as in its discretion will be adequate to cover the cost of operation of the state wholesale liquor business, yield a reasonable profit, and be competitive with liquor prices in neighboring states."[2] Pursuant to its delegated authority, the Commission promulgated Regulation 25,[3] which gives military clubs an option to purchase liquor either from the Commission or directly from the distiller. Of the four military organizations involved, two are located on Keesler Air Force Base and the Naval Construction Battalion Center in Harrison County, Mississippi. The United States possesses exclusive jurisdiction over these bases. The remaining two are operated on Columbus Air Force Base and Meridian Naval Air Station in Lauderdale County, Mississippi. The United States and the State of Mississippi exercise concurrent jurisdiction on these bases. All of the clubs have opted to procure their liquor provisions directly from out-of-state distillers and suppliers. Under Regulation 25 these distillers and suppliers must remit the wholesale markup of 17% on distilled spirits and 20% on wine to the Commission or face severe sanctions.[4] After a considerable period of operations under the regulation, the United States insti-

1. Miss.Code Ann. § 67–1–41 (1972).

2. Miss.Code Ann. § 27–71–11 (1972).

3. SALES TO MILITARY POST EXCHANGES, ETC.
   Post exchanges, ship stores, and officers' clubs located on military reservations and operated by military personnel (including those operated by the National Guard) shall have the option of ordering alcoholic beverages direct from the distiller or from the Alcoholic Beverage Control Division of the State Tax Commission. In the event an order is placed by such organization directly with a distiller, a copy of such order shall be immediately mailed to the Alcoholic Beverage Control Division of the State Tax Commission.

All orders of such organizations shall bear the usual wholesale markup in price but shall be exempt from all state taxes. The price of such alcoholic beverages shall be paid by such organizations directly to the distiller, which shall in turn remit the wholesale markup to the Alcoholic Beverage Control Division of the State Tax Commission monthly covering shipments made for the previous month.

4. Any supplier who fails to comply with the regulation is subject to delistment—withdrawal of the privilege of distributing alcoholic beverages to the Commission for resale in Mississippi—and to criminal prosecution. See Miss.Code Ann. §§ 67–1–45, 27–71–347 (1972).

tuted this litigation seeking declaratory and injunctive relief prohibiting application and enforcement of the regulation against purchases by the armed services clubs and a money judgment returning all revenues transmitted by these purchasers through their suppliers to the Commission. The complaint alleged that the State, through enforcement of Regulation 25, had unconstitutionally encroached upon the sovereignty of the United States by (1) legislating as to territory over which the federal government enjoys exclusive jurisdiction, (2) exacting a tax from federal instrumentalities, and (3) obstructing federal military procurement regulations and policy.

■ On the basis of the State's express XXI Amendment regulatory dominion over' packaged liquor transactions, this court sustained the regulation in the face of the government's constitutional attacks, found it unnecessary to reach the remaining questions and rendered judgment in favor of the defendant Commission. United States v. State Tax Commission, 340 F.Supp. 903 (S.D. Miss.1972). On direct appeal the United States Supreme Court reversed, holding that we erred "in concluding that the Twenty-first Amendment provides the State with sufficient authority over liquor transactions to support the application of the Regulation to the two bases over which the United States exercises exclusive jurisdiction . . . ." 412 U.S. 363, 368, 93 S.Ct. 2183, 2187, 37 L. Ed.2d 1 (1973). The Court's mandate vacated the judgment for the Commission and remanded the cause to us for determination of the issues we declined to reach in our prior decision.[5]

## I. Exclusive Federal Enclaves

While acknowledging that it cannot assert its XXI Amendment police powers as to the transportation or importation of intoxicating liquors into exclusively federal enclaves, the Tax Commission nevertheless contends that Congress has, by virtue of the Buck Act, 4 U.S.C. A. §§ 104–110 (Supp.1974), authorized and consented to the application of Mississippi's markup to wholesale liquor transactions between nonresident distillers and suppliers and the federal operatives on such military bases. Section 105(a) of the Act provides:

> No person shall be relieved from liability for payment of, collection of, or accounting for any sales or use tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, on the ground that the sale or use, with respect to which such tax is levied, occurred in whole or in part within a Federal Area . . . ."

Act of July 30, 1947, § 1, 61 Stat. 644, 4 U.S.C. § 105(a).[6] Another provision of

---

5. Although it is arguable that this declaratory and injunctive action would not fall within the ambit of 28 U.S.C. § 2281 if the sole basis of relief advanced by the government was premised on the repugnance of Regulation 25 to federal procurement policy and regulations, see, e. g., Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965); see also Oklahoma Natural Gas Co. v. Russell, 261 U.S. 290, 43 S.Ct. 353, 67 L.Ed. 659 (1923), the substantial constitutional question raised by the government's assertion of state tax immunity renders this cause appropriate for disposition by three judges and satisfies the jurisdictional prerequisites of the statute. See, e. g., Department of Employment v. United States, 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966); United States v. Georgia Public Service Commission, 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963); Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); Query v. United States, 316 U. S. 486, 62 S.Ct. 1122, 86 L.Ed. 1616 (1942); United States v. Livingston, 179 F.Supp. 9 (E.D.S.C.1959), aff'd, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960); see also Sands v. Wainwright, 491 F.2d 417 (5th Cir 1973).

6. This statute was enacted in response to the decision in James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1938), in which the Supreme Court held that the states had no constitutional power to tax the income or receipts from transactions occurring on or services performed in an area over which the United States pos-

the statute, section 107(a), limits section 105(a) by providing that it "shall not be deemed to authorize the levy or collection of any tax on or from the United States or any instrumentality thereof . . . ." 4 U.S.C.A. § 107(a) (Supp.1974). The Supreme Court certified two Buck Act issues for determination by this court on remand: "Whether the markup should be treated as a tax on sales occurring within a federal area within the meaning of § 105(a), . . . and, if so, whether the exception contained in § 107(a) nevertheless serves to remove the markup from the consent provision for purposes of the two exclusively federal enclaves . . . ." 412 U.S. at 379, 93 S.Ct. at 2193. Because we conclude that the first of these questions should be resolved in the affirmative and the second in the negative, we hold that Congress has legislatively acceded to Mississippi's markup on such wholesale liquor transactions.

At the election of the military, every sale at issue here is consummated directly between the military organizations and the out-of-state liquor vendors without recourse to the State's wholesaling, warehousing or delivery service. The post exchanges, ship's stores, and officers' clubs chose the alternative course afforded by regulation 25 of placing their orders directly with the wholesalers, who are required to mail immediately a copy of the order to the Commission.[7] The base price to the military vendees is determined solely by the vendor. All that Mississippi requires is that the vendor add the prescribed "wholesale markup" of 17% on whiskies or 20% on wines to the base price, and, after payment remit the amount of such markup to the Commission.

Neither party construes the markup as anything other than a tax. Although it serves to defray the cost to the State of its warehousing service and to regulate the traffic in intoxicating beverages, the markup is levied and recovered by compulsion of law in an amount that will, in the Commission's discretion, "yield a reasonable profit and be competitive with liquor prices in neighboring states." Such profits are paid into Mississippi's general revenue fund.[8] In this factual setting we do not hesitate to denominate the wholesale markup as a tax—"an exaction for the support of the government." United States v. Butler, 297 U.S. 1, 61, 56 S.Ct. 312, 317, 80 L.Ed. 477 (1936).

Similarly, the markup constitutes a "sales or use tax" within the ambit of section 105(a). Although it may more precisely be characterized as an excise or privilege tax on those who wish to distribute distilled spirits within Mississippi, the markup, however labeled, clearly conforms to the Buck Act's definition of a sales or use tax, namely "any tax levied on, with respect to, or measured by, sales, receipts from sales, purchases, storage, or use of tangible personal property." 4 U.S.C.A. § 110(b) (Supp.1974).

With these preliminary issues resolved, we must determine whether Mississippi has attempted to levy or collect a "tax on or from the United States or any instrumentality thereof" as condemned by section 107(a). At the outset of this inquiry, it is clear that the ship's stores, officers' clubs and post exchanges "as now operated are arms of the government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, share in fulfilling

---

sesses exclusive jurisdiction. S.Rep. No. 1625, 76th Cong., 3rd Sess. (1940). A state has jurisdiction to impose a tax only on those activities that are carried on within its territorial limits. James v. Dravo Contracting Co., *supra*, 302 U.S. at 138, 53 S.Ct. at 211.

7. *See* note 3, *supra;* Miss.Code Ann. § 67–1–73 (1972).

8. Miss.Code Ann. § 27–71–29 (1972).

the duties entrusted to it, and partake of whatever immunities it may have under the constitution and federal statutes." Standard Oil Co. v. Johnson, 316 U.S. 481, 485, 62 S.Ct. 1168, 1170, 86 L.Ed. 1611 (1942); *see also* 5 U.S.C. § 2105 (c).[9]

The government maintains that section 107(a) represents an express congressional reaffirmation of the venerable principle of federal immunity from state taxation promulgated by McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579 (1819). That doctrine, it contends, constitutionally proscribes Mississippi's markup on wholesale liquor sales to these military vendees.[10] Although it has never been doubted that Congress is constitutionally vested with the authority to insulate federal instrumentalities, vendors and contractors from state taxation by extending the mantle of federal tax immunity beyond the bounds which the Supreme Court has determined the

Constitution impliedly warrants,[11] neither the legislative history nor any judicial decision attributes to the Buck Act any congressional intention to exercise that legislative prerogative. We hold that section 107(a) goes no further than to restate the constitutional limit.[12] Hence, we must reconcile Mississippi's wholesale liquor markup as applied *sub judice*, with that relatively obscure doctrine.

For one hundred and twenty years this Court has been concerned with claims of immunity from taxes imposed by one authority in our dual system of government because of the taxpayer's relation to the other. The basis for the Court's intervention in this field has not been any explicit provision of the Constitution. The States, after they formed the Union, continued to have the same range of taxing power which they had before, barring only duties affecting exports,

**9.** For a discussion of the various hallmarks of federal instrumentalities see First Agricultural National Bank v. State Tax Commission, 392 U.S. 339, 352–354, 88 S.Ct. 2173, 2180–2181, 20 L.Ed.2d 1138 (1968) (Marshall, J., dissenting).

**10.** The government contends also that the Buck Act cannot assent to state taxation of sales to military clubs on exclusive federal bases since those transactions, which are completed directly with out-of-state wholesalers, do not occur on the bases or in any area within the jurisdiction of the State of Mississippi. However, the very language of the Buck Act answers the argument. "[T]he sale . . . with respect to which such tax is levied," is within the Act's purview if it "occurred in whole or in part within a Federal area." 4 U.S.C. § 105(a). Certainly a crucial part of these sales—delivery for intended use—occurred on these bases.

**11.** See, e. g., First Agricultural National Bank v. State Tax Commission, *supra*, 392 U.S. at 352, 362, 88 S.Ct. at 2180, 2185 (Marshall, J., dissenting); United States v. City of Detroit, 355 U.S. 466, 474, 78 S.Ct. 474, 478, 2 L.Ed.2d 424 (1958); United States v. Allegheny County, *supra*, 322 U.S. at 196, 64 S.Ct. at 920 (Frankfurter, J., dissenting); James v. Dravo Contracting Company, *supra*, 302 U.S. at 161, 58 S.Ct. at 221.

**12.** It is possible to construe the pertinent language of Section 107(a), which states that "[t]he provisions of sections 105 and 106 . . . shall not be deemed to authorize the levy or collection of any tax on or from the United States or any instrumentality thereof . . . .," in either of two ways. The first interpretation would say that this portion of the Buck Act merely reaffirms the traditional immunity doctrine. The second view would read it as broadly declaring the federal government and its instrumentalities free from the burden of all state vendor and vendee sales or use taxes. However, in the absence of any contemporaneous congressional comment indicating that a total tax immunity for federal instrumentalities was intended, see S.Rep. No. 1625, 76th Cong., 3rd Sess. (1940), we opt for the first view. If an all-pervasive exemption was desired, more ample language than that which merely outlines the constitutional minimum as prescribed by *McCulloch* surely would have been chosen. The question of which construction is proper is not free of difficulty. *See* Powell, The Waning of Intergovernmental Tax Immunities, 58 Harv.L.Rev. 633 (1945). Any state tax that abridges the federal government's immunity must, therefore, lie outside the consensual provisions of Section 105(a) by force of the exceptive language of Section 107(a), and vice versa.

imports, and on tonnage. Congress, on the other hand, to lay taxes in order "to pay the Debts and provide for the common Defence and general Welfare of the United States", Art. 1, Sec. 8, U.S.C.A.Const., can reach every person and every dollar in the land with due regard to Constitutional limitations as to the method of laying taxes. But, as is true of other great activities of the state and national governments, the fact that we are a federalism raises problems regarding these vital powers of taxation. Since two governments have authority within the same territory, neither through its power to tax can be allowed to cripple the operations of the other. Therefore state and federal governments must avoid exactions which discriminate against each other or obviously interfere with one another's operations. These were the determining considerations that led the great Chief Justice to strike down the Maryland statute [in McCulloch v. Maryland, *supra*] as an unambiguous measure of discrimination against the use by the United States of the Bank of the United States as one of its instruments of government.

Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 488, 59 S.Ct. 595, 602, 83 L.Ed. 927 (1939) (Frankfurter, J., concurring) (footnote omitted).[13] For over a century federal immunity was increscent. With consistency, courts disallowed state taxes on persons dealing with the government[14] until the seminal decisions in James v. Dravo Contracting Co., *supra*, and Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941), heralded a modern reappraisal of the doctrine.

> After having long been the subject of differences of opinion, the extent of this implied immunity was greatly curtailed. The basis of the doctrine was shifted from that of an argumen-

13. The doctrine was born of the necessity of protection of the functions of each sovereignty, operating in the same territory, from a frustrating taxing power of the other. Since the principle requires immunity from the economic burden of the other's taxes, it is not surprising that in an earlier year when governments were small and taxes and economics less complex, a concentration upon the economic burden should have led to an extension of the doctrine to persons dealing with the governments. Taxation of salaries of government employees and of the activities of vendors to government of goods and services created an economic burden readily perceived, if imperfectly measured. Carried to its extreme in modern society, however, the logical extension of the doctrine would be ridiculous. Economists may estimate the total tax increment in the cost of a complicated machine or of construction of a building, but an attempt to relieve a purchasing sovereign of the economic burden of all taxes, however remote and indirectly imposed, would not only be impossible of accomplishment, but would seriously disrupt the functions of each of the dual sovereignties. Confinement of the extension was difficult, for distinctions between imposts more or less remote and indirect frequently lacked substance. Furthermore, it was not easy to see why the obligations of a manufacturer to the state and community, whose protection and services he enjoyed, should vary with the fluctuations in the ratio of his sales to the United States to his total sales.
United States v. Livingston, *supra*, 179 F. Supp. at 19–20 (Haynesworth, J.).

14. In Panhandle Oil Co. v. Mississippi ex rel. Knox, 277 U.S. 218, 48 S.Ct. 451, 72 L.Ed. 857 (1928), the court invalidated Mississippi's privilege tax on retail gasoline dealers, which was measured by the amount of gasoline sold, as applied to retail sales to the Coast Guard and a Veteran's Hospital, both federal instrumentalities. The Court likewise overturned an Alabama excise tax on gasoline distributors as ratably imposed on their sales to the federal government in Graves v. Texas Co., 298 U.S. 393, 56 S.Ct. 818, 80 L.Ed. 1236 (1936).
Both *Panhandle Oil* and *Graves* were overruled to the extent they were inconsistent with the reasoning and result in Alabama v. King & Boozer, *infra*. What is left of their value as precedent is a matter of speculation only. We note also that the Court was faced with and unable to reach precisely the same question posed *sub judice* by enforcement of the markup as to military exchanges on exclusively federal enclaves in Query v. United States, *supra*, and Standard Oil Co. v. Johnson, *supra*.

tative financial burden to the Federal Government to that of freedom from discrimination against transactions with the Government and freedom from direct impositions upon the property and the instrumentalities of the Government. The decisions in James v. Dravo Contracting Co. [*supra*], and State of Alabama v. King & Boozer [*supra*], mean nothing unless they mean that it is not enough that the Government may ultimately have to bear the cost of a part or even the whole of a tax which a State imposes on a third person who has business relations with the Government, when a State could impose such a tax upon such a third person but for the fact that the transaction which gave rise to it was not with a private person but with the Government.

United States v. Allegheny County, *supra*, 322 U.S. at 195–196, 64 S.Ct. at 919–920 (Frankfurter, J., dissenting) (citations omitted).

In *James* the Court sustained West Virginia's tax on the gross receipts of a government contractor, holding that the "valid exaction" was not a direct burden nor laid upon the federal government, its property, or its instrumentality and did "not interfere in any substantial way with the performance of federal functions . . . ." 302 U. S. at 161, 58 S.Ct. at 221. The King & Boozer Court upheld application of Ala-

bama's sales tax to the purchase of lumber by a federal contractor for use in completing construction of an army camp under a cost-plus-fixed-fee contract.[15] These cases buried the notion that a state exaction offended the Constitution merely because the United States or its operatives ultimately bore the economic burden imposed by the tax.

The Government, rightly we think, disclaims any contention that the Constitution, unaided by Congressional legislation, prohibits a tax exacted from the contractors merely because it is passed on economically, by the terms of the contract or otherwise, as a part of the construction cost to the Government. So far as such a nondiscriminatory state tax upon the contractor enters into the cost of the materials to the Government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties. The asserted right of the one to be free of taxation by the other does not spell immunity from paying the added costs, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity. So far as a different view has prevailed, see Panhandle Oil Co. v. State ex rel. Knox, supra; Graves v. Texas Co., supra, we think it no longer tenable.

Alabama v. King & Boozer, *supra*, 314 U.S. at 8–9, 62 S.Ct. at 45.[16] *King &*

---

15. In Silas Mason Co. v. Tax Commission, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187 (1937), the Court approved an occupation tax levied by the State of Washington upon the gross receipts of a federal contractor who had been engaged in constructing the Grand Coulee Dam. The decision in Curry v. United States, 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9 (1941), sustained enforcement of Alabama's use tax (against the same contractor involved in *King & Boozer*) as to materials purchased from an out-of-state vendor for performance of the federal contract.

16. Chief Justice Hughes wrote for the *James* Court as follows:

There is no ineluctable logic which makes the doctrine of immunity with respect to

government bonds applicable to the earnings of an independent contractor rendering services to the government. That doctrine recognizes the direct effect of a tax which 'would operate on the power to borrow before it is exercised' . . . and which would directly affect the government's obligation as a continuing security. Vital considerations are there involved respecting the permanent relations of the government to investors in its securities and its ability to maintain its credit; considerations which are not found in connection with contracts made from time to time for the services of independent contractors. And in dealing with the question of a taxability of such contractors upon the fruits of their work, we are not bound to consider or decide how far

*Boozer,* although incidentally different on its facts from the instant case, established the principle, which has been subsequently refined and reaffirmed,[17] that the Constitution only forbids a state tax whose legal, as opposed to purely economic, incidence falls upon the federal government, its property or its instruments, either by virtue of the terms of the federal contract [18] or the plain words of the state's taxing legislation as sensibly construed. The touchstone for our inquiry, therefore, is the point of legal incidence of Mississippi's wholesale markup on alcoholic beverages.

■■■ The abstraction "legal incidence" is a term that has never been explicitly formulated by the Supreme Court. We construe it to mean the legally enforceable, unavoidable liability for nonpayment of the tax. The legal incidence of a tax falls upon that entity or person to whom the state under a reasonable interpretation of its entire taxing scheme ultimately looks for satisfaction of the exaction. *Cf.* Colorado National Bank v. Bedford, 310 U.S. 41, 52, 60 S.Ct. 800, 805, 84 L.Ed. 1067 (1940). The government argues that the "legal incidence" of a tax, which it contends connotes more than the direct obligation to pay, falls upon "a person who is unable to shift it onto someone else and who thereafter bears the money burden of the tax." It points here to the fact that it in the end must bear the cost of the markup since the supplier is required by the regulation both to collect it from the military purchaser and pay it over to the State. This proposition was laid to rest in *King & Boozer.* We conclude that under Regulation 25 as written and enforced the legal incidence of the markup attaches to the wholesaler despite the fact that he is required "in turn to remit" the wholesale tax to the Commission out of the proceeds of sale.

"[W]e are not bound by the state court's characterization of the tax," First Agricultural National Bank v. State Tax Commission, *supra,* 392 U.S. at 347, 88 S.Ct. at 2177, which is ordinarily of great weight if it is consistent with a reasonable construction of the taxing scheme, American Oil Co. v. Neill, 380 U.S. 451, 85 S.Ct. 1130, 14 L. Ed.2d 1 (1965); Colorado National Bank v. Bedford, *supra,* because "the duty rests on this Court to decide for itself facts or constructions upon which federal constitutional issues rest." Kern-Limerick, Inc. v. Scurlock, *supra,* 347 U.S. at 121, 74 S.Ct. at 410; *see, e. g.,* United States v. Allegheny County, *supra,* 322 U.S. at 184, 64 S.Ct. at 914; Carpenter v. Shaw, 280 U.S. 363, 367–368, 50 S.Ct. 121, 123, 74 L.Ed. 478 (1930).

Although the parties have not cited and we have not found any Mississippi decision that judicially interprets either Regulation 25 or the applicable provisions of the alcoholic beverage control statute, our guideposts are plain.

When passing on the constitutionality of a state taxing scheme it is

---

immunity from taxation is to be deemed essential to the protection of government in relation to its purchases of commodities or whether the doctrine announced in the cases of that character which we have cited deserves revision or restriction.
James v. Dravo Contracting Co., *supra,* 302 U.S. at 152–153, 58 S.Ct. at 217–218. The dissent of Mr. Justice Roberts details the pre-*James* concept of federal tax immunity. *See* 302 U.S. at 161, 58 S.Ct. at 221.

17. *See, e. g.,* United States v. Boyd, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964); Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 382 n. 12, 84 S.Ct. 378, 388 n. 12, 11 L.Ed.2d 389 (1964); United States v. City of Detroit, *supra;* United

States v. Township of Muskegon, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958); Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954).

18. In Kern-Limerick, Inc. v. Scurlock, *supra,* the Court distinguished *King & Boozer* and held that the federal cost-plus-fixed-fee contract, which provided that the United States would assume title to and liability for materials purchased in performance thereof by the federal contractor, who had been delegated authority to act as the government's purchasing agent, operated to shift the legal incidence of a state sales tax from the contractor-purchaser to the federal government, thereby rendering it unconstitutional.

firmly established that this Court concerns itself with the practical operation of the tax, that is, substance rather than form. . . . This approach requires us to determine the ultimate effect of the law as applied and enforced by a State or, in other words, to find the operating incidence of the tax.

American Oil Co. v. Neill, *supra*, 380 U. S. at 455, 85 S.Ct. at 1133 (citations omitted).

[T]he implied immunity of one government and its agencies from taxation by the other should, as a principle of constitutional construction, be narrowly restricted. For the expansion of the immunity of the one government correspondingly curtails the sovereign power of the other to tax, and where that immunity is invoked by the private citizen it tends to operate for his benefit at the expense of the taxing government and without corresponding benefit to the government in whose name the immunity is claimed.

Graves v. New York ex rel. O'Keefe, *supra*, 306 U.S. at 483, 59 S.Ct. at 600.

Some time after Regulation 25 was adopted, wholesalers and military organizations began a practice of depositing the amount of the markup on each sale into an escrow account rather than remitting it to the State Tax Commission. When this practice was discovered the Director of the Alcoholic Beverage Control Division wrote a letter to all wholesalers which mandated strict compliance with the regulation, as it was interpreted in the director's letter, on pain of criminal penalties and delistment for all future sales in the State. The letter required the wholesaler to prepay the markup to the Commission at the time of shipment to the military customer and thereafter to invoice and collect the fee from the ship's store, officers' club or post exchange. We deem it significant that the letter's commands were directed to the numerous wholesalers involved, rather than to the four military establishments. Of equal cogency is the director's requirement that the whole-saler pay the tax *in advance* of its collection from his customer.

Since they chose not to deal with the Commission, the military-vendees' only financial responsibility is to the wholesaler for the debt incurred for the intoxicating liquors obtained. The vendor may fix the price at which he sells altogether free of any state control or restraint. Thus, it is he who controls where the burden of the markup eventually falls. By adjusting his selling price he may absorb the markup entirely or pass some or all of it along to the military purchaser. In view of the decision to buy direct, the only effect on these military sales which necessarily results from Mississippi's law or regulation is the grant of an exemption from all "state taxes" under Regulation 25.

Only the wholesalers and suppliers have been or will be subject to criminal prosecution or economic sanction at the hands of the State. Mississippi's ABC Act and regulations do not impose any sanctions on the vendor if he absorbs all or any portion of the markup's economic burden, nor do they return a percentage of the revenues to the wholesaler as a commission for collecting the tax. *See* First Agricultural National Bank v. State Tax Commission, *supra*; United States v. Nevada Tax Commission, 291 F.Supp. 530 (D.Nev.1968), aff'd, 439 F. 2d 435 (9th Cir. 1969). The purchaser-vendee is not legally or otherwise obligated to the Commission or the State for payment of the markup. *See* Alabama v. King & Boozer, *supra.*

Since the tax must be prepaid by the seller, it can never become a debt to the supplier separate from the total sales price, nor is it recoverable at law from the purchaser. Neither the statute nor the regulation contain a prohibition against advising or even advertising that the markup will be absorbed or refunded. *See* Federal Land Bank v. Bismarck, 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65 (1941). Ultimately the markup is paid from the assets or gross receipts of the wholesaler, *see* Colorado National Bank v. Bedford, *supra*, whose liability

to the State cannot be defeated by his failure, inability, or refusal to collect the tax or by the impracticability of doing so. *See* United States v. Livingston, *supra*, 179 F.Supp. at 30 (Timmerman, D. J., dissenting). Any actual shift of the tax to the military which the wholesaler may be able to effect would be wholly negotiated rather than mandated by State law.[19]

The government's argument that the reasoning in First Agricultural National Bank v. State Tax Commission, *supra*, compels the conclusion in this case that the legal incidence of the markup falls upon the military purchasers is misplaced. There the Court held that the legal incidence of a state sales tax, which "by its terms must be passed on to the purchaser," was imposed not on the vendor, who was prohibited from advertising that he would assume or absorb the tax, but on the vendee national bank. Mr. Justice Black, writing for the majority, stated:

We cannot accept the reasoning of the court below that simply because there is no sanction against a vendor who refuses to pass on the tax (assuming this is true), this means the tax is on the vendor. There can be no doubt from the clear wording of the statute that the Massachusetts Legislature intended that this sales tax be passed on to the purchaser. For our purposes, at least, that intent is controlling.

First Agricultural National Bank v. State Tax Commission, *supra*, 392 U.S. at 348, 88 S.Ct. at 2178. The instant wholesale liquor markup on military sales is not afflicted with either of the statutory infirmities that Mr. Justice Black found compelling. When considered within the factual matrix of this record, it is abundantly clear that the legal incidence of the markup was intended to be levied upon and borne by the controlled wholesaler rather than the military purchaser.[20]

19. In contrast, Mississippi's *sales* tax must be added to the sale price and collected by the vendor from the vendee at the time of purchase. Miss.Code Ann. § 27–65–31 (1972). This sales tax not only constitutes a legal obligation from the vendor to the State, Miss.Code Ann. § 27–65–41 (1972), but creates a debtor-creditor relationship between the vendor and his vendee, who is legally liable to his vendor for the full amount of the tax, even if the seller has unlawfully failed to collect it from him. *See* Woodrich v. St. Catherine Gravel Co., 188 Miss. 417, 195 So. 307 (1940). We note also that the Navy Exchange Manual provides as follows:

2634 SALES AND USE TAXES

The courts have made a distinction between the "legal incidence" of a tax and its "economic burden." Thus, the courts have come to hold that a state may not impose a tax, the "legal incidence" of which falls directly upon the Federal Government or any of its instrumentalities. That means that a state may neither require an Exchange to pay a tax which is imposed directly upon it, nor require it to collect a tax imposed upon its authorized patrons. A state may, however, validly impose a tax which affects the Exchange only indirectly by increasing the cost of the supplies that it purchases.

In such a case, the economic burden would eventually fall upon the Exchange, but the

legal incidence would be elsewhere. Therefore, when a state imposes a tax directly upon a supplier to the Exchange and it is his obligation to collect and pay it, the tax is valid, even though the Exchange would eventually bear the burden of the tax, economically, by paying higher prices.

2615 TAXES IMPOSED ON SUPPLIERS AND CONTRACTORS

Federal and state taxes may be imposed on contractors and suppliers who have dealings with Exchanges. When the legal incidence of the tax is not on the Exchange, the constitutional immunity of the Exchange as a U. S. Government instrumentality does not apply. The Exchange, in the case of a tax on contractors or suppliers, would eventually bear the economic burden of the Tax in the form of increased cost of the supplies purchased, unless an exemption were provided by the taxing authority. However, this economic burden does not invalidate the tax.

20. *See* K. Wolf, State Taxation of Government Contractors 221–29 (1964); Powell, The Remnant of Intergovernmental Tax Immunities, 58 Harv.L.Rev. 757, 763 (1945). *Compare* American Oil Co. v. Neill, *supra* (legal incidence of privilege tax on gasoline dealer-vendor); Polar Ice Cream & Creamery Co. v. Andrews, *supra* (legal incidence

On these facts, therefore, we conclude that the markup, which is a tax on sales occurring within a federal area within the scope of section 105(a), lies outside the section 107(a) exception to the Act's consent provision since Mississippi has not attempted to levy or collect any tax on or from the United States or any instrumentality thereof. Because the wholesale markup lies within the consensual ambit of the Buck Act, we hold that Congress has waived any federal challenge to the authority of the State of Mississippi over these transactions and has assented to the state's enforcement of Regulation 25 on Keesler Air Force Base and the Naval Construction Battalion Center over which the United States exercises otherwise exclusive jurisdiction. *See* Polar Ice Cream & Creamery Co. v. Andrews, *supra*, 375 U.S. at 383, 84 S.Ct. at 391; *cf.* Howard v. Commissioners of Sinking Fund, *supra*.[21]

## II. *Concurrent State and Federal Enclaves*

We now turn our attention to the somewhat different problems that arise from enforcement of the markup on Columbus Air Force Base and Meridian Naval Air Station, over which Mississippi and the United States enjoy concurrent sovereignty. Because the State's XXI Amendment power to regulate distilled spirits by definition extends to joint state and federal enclaves, the Supreme Court concluded that, on this remand, the government would be unable "to rest its claim for immunity from the markup with respect to purchases of liquor for the nonappropriated fund activities of these bases on Art. I, § 8, cl. 17." 412 U.S. at 380, 93 S.Ct. at 2193. This portion of the Constitution empowers Congress to "exercise exclusive Legislation . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

The government restates its contention that, when applied to purchases by military clubs on concurrent state and federal areas, the markup infringes the constitutional immunity of federal instrumentalities from state taxation. In addition, it contends that enforcement of the Commission's regulatory and taxing scheme on these military purchases of

of privilege tax on milk processor-distributor); Esso Standard Oil v. Evans, 345 U.S. 495, 73 S.Ct. 800, 97 L.Ed. 1174 (1953) (legal incidence of gasoline storage tax on distributor); Howard v. Commissioners of Sinking Fund, 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953) (legal incidence of city income-privilege tax on earnings of government employees); Norton Co. v. Dept. of Revenue, 340 U.S. 534, 71 S.Ct. 377, 95 L.Ed. 517 (1951) (legal incidence of privilege-sales tax on vendor); Silas Mason Co. v. Tax Commission, *supra* (legal incidence of privilege tax on federal contractor); United States v. Dept. of Revenue, 202 F.Supp. 757 (N.D.Ill.1962), aff'd, 371 U.S. 21, 83 S.Ct. 117, 9 L.Ed.2d 95 (1963) (legal incidence of privilege-sales and use taxes on retailer); United States v. Sharp, 302 F.Supp. 668 (S.D.Miss.1969) (legal incidence of privilege-sales tax on gasoline distributor) *with* Sullivan v. United States, 395 U.S. 169, 89 S.Ct. 1648, 23 L.Ed.2d 182 (1969) (legal incidence of sales and use taxes on purchaser); First Agricultural National Bank v. State Tax Commission, *supra* (legal incidence of sales and use taxes on vendee national banks);

Kern-Limerick, Inc. v. Scurlock, *supra* (legal incidence of sales tax on purchaser); Curry v. United States, *supra* (legal incidence of use tax on purchaser); Alabama v. King & Boozer, *supra* (legal incidence of sales tax on purchaser); Federal Land Bank v. Bismarck, *supra* (legal incidence of sales tax on purchaser); Colorado National Bank v. Bedford, *supra* (legal incidence of service tax on user); United States v. Livingston, *supra* (legal incidence of sales and use taxes on purchaser); United States v. Nevada Tax Commission, *supra* (legal incidence of sales and use taxes on purchaser).

21. Because we hold that the United States has assented statutorily to application of the markup to purchases of liquor by the military clubs on the exclusively federal bases, we need not reach the government's contention that the regulatory and taxing scheme impermissibly interferes with federal liquor procurement policy and regulations, a question which we resolve against the government's position in part II, *infra*, as to purchases by the military on concurrent state and federal areas.

alcoholic beverages is constitutionally repugnant to the Supremacy Clause because this exercise of state power conflicts with federal military procurement regulations and policy. Our prior holding, however, that the wholesale markup does not abridge the military's constitutional and Buck Act immunity from state taxation on exclusive jurisdiction bases applies with equal force against, and hence forecloses, the government's assertion of similar immunity with respect to wholesale purchases by military affiliated organizations on joint state – federal areas as well.

The Tax Commission contends that the consensual language of the Buck Act, 4 U.S.C. § 105(a), which we hold permits Mississippi to enforce the markup on exclusively federal military enclaves, is also applicable to and allows its enforcement against liquor purchases by the military on the joint state – federal bases. Section 105(a) waives immunity from state taxation "on the ground that the sale or use, with respect to which such tax is levied, occurred in whole or in part within a Federal area; and such State or taxing authority shall have full jurisdiction and power to levy and collect any such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area." Section 110(e) of the Act, which defines a federal area as "any lands or premises held or acquired by or for the use of the United States . . . which [are] located within the exterior boundaries of any State . . . ," does not settle the point. The legislative history, however, demonstrates that the Act was designed to overrule that portion of the decision in James v. Dravo Contracting Co., *supra*, which exempted from state taxation the income or receipts from transactions occurring or services performed within exclusively federal enclaves. At the same time the *James* Court sustained the state's power to tax income or receipts which were derived from activities that occurred on areas subject to concurrent state and federal jurisdiction. The legislative history, therefore, supports the inference that the Buck Act was not intended to apply to concurrent state and federal enclaves to which the state's taxing jurisdiction already extends by conveyance or consent. *See* James v. Dravo Contracting Co., *supra*. The Buck Act only operates to restore parity to an existing state right to tax. It does not create any new taxing power on the concurrent jurisdiction bases. Indeed, it contains an express disclaimer of any waiver of the federal government's constitutional immunity from state taxation. 4 U.S.C. § 107(a).

■ Our concluding task is to harmonize the State's XXI Amendment prerogative and the power of the federal government to execute its military procurement policy on concurrent jurisdiction bases. Art. I, § 8, invests Congress with authority "[t]o make all laws which shall be necessary and proper for carrying into Execution" its delegated power "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States . . . ." Art. IV, § 3, cl. 2, grants it "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." Pursuant thereto, Congress enacted 50 U.S.C. App. § 473, which provides:

> The Secretary of Defense is authorized to make such regulations as he may deem to be appropriate governing the sale, consumption, possession of or traffic in beer, wine, or any other intoxicating liquors to or by members of the Armed Forces or the National Security Training Corps at or near any camp, station, post, or other place primarily occupied by members of the Armed Forces or the National Security Training Corps.

Acting in accordance with his delegated authority, the Secretary of Defense promulgated Department of Defense Directive 1330.15, 32 C.F.R. § 261 (1973),

which sets forth in pertinent part department policy governing the purchase and sale of alcoholic beverages by all components of the armed services through on-base outlets:

1.   [The Department of Defense] will cooperate with all duly constituted regulatory officials (local, state and Federal) to the degree that the duties of such officials are related to the furtherance of the terms of this Directive.   However, the purchase of all alcoholic beverages for resale at any camp, post, station, base or other place primarily occupied by members of the Armed Forces within the United States shall be in such a manner and under such conditions as shall obtain for the Government the most advantageous contract, price and other factors considered, *without regard to prices locally established by state statute or otherwise.*

2.   This policy of cooperation is not to be construed or represented as an admission of any legal obligation to submit to state control.

32 C.F.R. § 261.4(c) (1966) (emphasis added).   On June 9, 1966, the directive was amended by deleting the italicized words in ¶ 1.

Pointing to the decisions in Paul v. United States, *supra,* and Mayo v. United States, 319 U.S. 441, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943), the United States contends that enforcement of Regulation 25 by the State disrupts the federal policy of competitive procurement of alcoholic beverages under the most favorable terms to the military operatives, as reflected in the Secretary's directive, and improperly imposes significant operating conditions on the activities of federal instrumentalities.

In an important antecedent to these precedents, Penn Dairies, Inc. v. Milk Control Commission, 318 U.S. 261, 63 S. Ct. 617, 87 L.Ed. 748 (1943), it was asserted that Pennsylvania's regulation of the minimum wholesale price of milk on direct sales from suppliers to military establishments on commonwealth-owned land conflicted unconstitutionally with a federal procurement policy of competitive bidding.   The Supreme Court initially noted that the Constitution empowered Congress to set aside state taxation and regulation of government contractors which burdens the federal government. In view of this power, it upheld the state's regulatory program, declaring that where Congress has not expressed a limitation, courts should not imply a constitutional restriction upon otherwise valid exercises of state power.

Mayo v. United States, *supra,* established as a corollary to federal immunity from state taxation, the principle that, without congressional approval, the functions of federal instrumentalities must be free of restrictive state regulation.

*Mayo* invalidated Florida's regulatory quality controls on commercial fertilizer (which required each bag of fertilizer sold or distributed within the state to carry the label or stamp which evidenced payment of the state's inspection fee) as applied to fertilizers purchased by the United States Department of Agriculture and distributed to Florida farmers participating in a federal soil conservation program.   This paragraph from the Court's opinion is especially significant here:

These inspection fees are laid directly upon the United States.  They are money exactions the payment of which, if they are enforceable, would be required before executing a function of government.  Such a requirement is prohibited by the supremacy clause.  We are not dealing as in Graves v. State of New York, etc., supra, with a tax upon the salary of an employee, or as in State of Alabama v. King & Boozer [*supra*] with a tax upon the purchases of a supplier, or as in Penn Dairies, Inc. v. Milk Control Comm. of Pennsylvania [*supra*], with price control exercised over a contractor with the United States.  In these cases the exactions directly affected persons who were acting for themselves and not for the United

States. These fees are like a tax upon the right to carry on the business of the post office or upon the privilege of selling United States bonds through federal officials. Admittedly the state inspection service is to protect consumers from fraud but in carrying out such protection, the federal function must be left free. This freedom is inherent in sovereignty. The silence of Congress as to the subjection of its instrumentalities, other than the United States, to local taxation or regulation is to be interpreted in the setting of the applicable legislation and the particular exaction. . . . But where, as here, the governmental action is carried on by the United States itself and Congress does not affirmatively declare its instrumentalities or property subject to regulation or taxation, the inherent freedom continues.

Mayo v. United States, *supra,* 319 U.S. at 447–448, 63 S.Ct. at 1140–1141 (citations and footnote omitted); *see* Leslie Miller, Inc. v. Arkansas, 352 U.S. 187, 77 S.Ct. 257, 1 L.Ed.2d 231 (1956); Johnson v. Maryland, 254 U.S. 51, 41 S.Ct. 16, 65 L.Ed. 126 (1920).

Paul v. United States, *supra,* overturned California's regulation of the minimum wholesale milk prices paid by vendee military clubs and post exchanges as antagonistic to revised armed services procurement regulations. The Court concluded that the State's policy operated impermissibly there to eliminate competition.[22] *Penn Dairies* was distinguished on the basis of a change in federal procurement regulations. The regulations which were in effect when *Penn Dairies* was decided were considered to manifest a federal "hands off" policy regarding state minimum price legislation. On the other hand, the *Paul*

court found that "[t]he present [revised] Regulation makes no such allowances, contains no such qualifications, and provides for no such exception. Its unqualified command is that purchases for the Armed Services be made on a competitive basis; and it has, of course, the force of law." 371 U.S. at 254–255, 83 S.Ct. at 433.

Neither *Paul* nor *Mayo* are apropos here. Clearly Mississippi has not interfered with competition between wholesale vendors of alcoholic beverages to the military. Regulation 25 does not fix any price nor does it constitute any form of minimum price regulation. It applies evenly to all wholesale sales across the board. Moreover, the Buck Act evinces congressional acquiescence to the State's taxing and regulatory scheme. Since the markup applies pro-rata to all wholesale liquor transactions, it does not alter the vendee's competitive purchase equation and thus is incapable of interfering in any substantial way with the armed forces' policy of competitive liquor procurement under "the most advantageous contract, price and other factors considered."

Neither has Mississippi legislated directly or indirectly so as to impair any function of these federal instrumentalities. The parties have stipulated that payment of the markup has not prevented profitable operation by the officers' clubs, ship's stores and post exchanges. Indeed, the military organizations, which are prohibited by Defense Department regulation from underselling local retailers by more than 10%,[23] are not only permitted to purchase their intoxicating liquors at wholesale prices, but also are exempt from the 2.50 dollars per gallon excise tax charged to private Mississippi retailers,[24] who must also

---

22. *See* United States v. Georgia Public Service Commission, *supra;* Public Utilities Commission v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958).

23. 32 C.F.R. § 261.5(b)(3)(ii) (1973).

24. The parties have stipulated that other monopoly or control states collect a larger

markup on military liquor purchases than Mississippi. Furthermore, California, a licensed state, collects an excise tax of 2.00 dollars per gallon on distilled spirits on all purchases by the military or by the United States, relying on the Buck Act.

collect from their customers the State's 5% sales tax from which vendees of the military clubs are exempt under the Buck Act.[25] The government has not asserted that enforcement of the markup compromises any federal military goal or function, or that the State has imposed insufferable conditions on the military affiliates which stifle their operations. Nor has the government contended that Congress intended to abrogate or subordinate the State's XXI Amendment regulatory authority over liquor to any valid federal military purpose. Only the vendor, in his individual capacity, is subject to State control. The government's complaint is based solely upon the fact that it must bear the economic incidence of the markup. The most that can be said is that Regulation 25 may reduce the military's profit margin from retail liquor sales. The slight weight of this economic factor does not tip the balance in favor of a military exemption from the reach of the XXI Amendment.

We reject the government's argument that the markup is void as incompatible with federal procurement policy and regulations under Paul v. United States, *supra*, or as an impermissibly inhibitive regulation of the valid functions of a federal military instrumentality under Mayo v. United States, *supra*. *See* James v. Dravo Contracting Co., *supra*.

## III. *Conclusion*

Although the United States ultimately bears the economic burden of Mississippi's tax on the gross receipts from sales of liquor and wine by wholesalers and distillers, the legal incidence of the exaction is upon the seller. James v. Dravo Contracting Company and King & Boozer, *supra*, authorize this exaction. The constitutional balance between the war power decision of the United States to provide its armed forces personnel with low cost intoxicating beverages on Mis-

sissippi bases and the XXI Amendment power of the State to regulate traffic in such commodities weighs in favor of the State. There being no discrimination against the federal government within the State's tax scheme,[26] any adjustment of the resultant intergovernmental tax consequences must come from the Congress.

---

25. 4 U.S.C.A. § 107(a) (Supp.1974).

26. *See, e. g.*, Moses Lake Homes, Inc. v. Grant County, 365 U.S. 744, 81 S.Ct. 870, 6 L.Ed.2d 66 (1961) ; Phillips Chemical Co. v. Dumas Independent School Dist., 361 U.S. 376, 80 S.Ct. 474, 4 L.Ed.2d 384 (1960) ; United States v. City of Detroit, *supra*.