**HARVEY F. GAMAGE, SHIP-BUILDER, INC.**

v.

**Raymond L. HALPERIN, State Tax Assessor.[1]**

Supreme Judicial Court of Maine.

June 14, 1976.

L. Halperin became his successor and is presently State Tax Assessor.

Thompson, Willard & McNaboe, by James P. Lansing, Portland, for plaintiff.

Jerome S. Matus, Asst. Atty. Gen., Bureau of Taxation, Augusta, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, and DELAHANTY, JJ.

POMEROY, Justice.

A Superior Court Justice granted a motion for summary judgment in favor of the State Tax Assessor and against appellant, a shipbuilding corporation. The matter came to the Superior Court after a request for a refund of a part of the tax paid by appellant was refused by the State Tax Assessor. An appeal from that denial entered pursuant to the provisions of 36 M. R.S.A. § 2011 was the vehicle by the use of which the matter came to the Superior Court. The right to appeal to this Court is bottomed on the provisions of 36 M.R.S.A. § 1958. There is no procedural defect obstructing or barring our decision of the case on its merits.

We deny the appeal.

The question raised here is not new or novel. The claims of the appellant and the appellee are akin to claims made in the Supreme Court of the United States in 1819. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819).

The factual framework in which the issue as to the liability for sales tax, the return of part of which the appellant taxpayer sought refund, is substantially as follows:

F. J. O'Hara & Sons, Inc. made an application for subsidy pursuant to the provisions of 46 U.S.C.A. § 1401 et seq., the popular title of which is United States Fishing Fleet Improvement Act. On February 17, 1970, Harvey F. Gamage Shipbuilder, Inc., the United States of America acting through the Secretary of the Interior who acted under the provisions of the

United States Fishing Fleet Improvement Act, and Dorothy M. O'Hara, Inc. (who had been substituted for F. J. O'Hara & Sons, Inc.) entered into a contract by the terms of which Harvey F. Gamage Shipbuilder, Inc. was to construct a fishing vessel, the ROBERT F. O'HARA, in consideration of $544,474, 40.2% of which was to be paid by the United States government and 59.8% of which was to be paid by Dorothy M. O'Hara, Inc.[2]

The stated purpose of the United States Fishing Fleet Improvement Act was:

"In order to correct inequities in the construction of fishing vessels of the United States, the Secretary of the Interior is authorized to pay in accordance with this chapter a subsidy for the construction of such vessels in the shipyards of the United States." 46 U.S.C.A. § 1401.

This statement of purpose appears in the Act by virtue of a 1964 amendment. The purpose which appeared in the Act on the date of its original enactment on June 12, 1960, Pub.L. 86–516, § 1, 74 Stat. 212, was to assist certain depressed segments of the fishing industry. The Act provided for certain eligibility conditions, among them being that the

"plans and specifications for the fishing vessel are suitable for use in the fishery in which that vessel will operate and suitable, in the case of a new fishing vessel and, when appropriate, a remodeled vessel, for use by the United States for National Defense or military purposes in time of war or National emergency, . . .." 46 U.S.C.A. § 1402.

Section 1408 of Title 46 provided that:

"Every contract executed by the Secretary pursuant to section 1403 of this title shall provide that in the event the United States shall, through purchase or requisition, acquire ownership of any fishing vessel on which a construction subsidy was paid, the owner shall be paid therefor the value thereof, but in no event shall such payment exceed the actual depreciated construction cost thereof (together with the actual depreciated cost of capital improvements thereon) less the depreciated amount of construction subsidy theretofore paid incident to the construction of such vessel, . . . .."

In the "Confidential Cost Estimates" which were submitted to Dorothy M. O'Hara, Inc. and the United States government, the appellant listed under the item Taxes, "State of Maine Sales Tax 5% x $518,807 = $25,940.00."

The contract was apparently performed satisfactorily, and the total sum of $544,747 which included sales tax in the amount of $25,940.35 was paid, 40.2% by funds of the United States government and 59.8% by Dorothy M. O'Hara, Inc.

On October 30, 1971 appellant paid the sales tax in the amount of $25,940.35 on the entire purchase price. On February 3, 1972,[3] appellant applied to the State Tax Assessor for a refund of $10,920.89[4] which it claimed represented that proportion of the tax paid by the United States government. The request, after hearing, was denied by the State Tax Assessor, and this appeal which ultimately reached us was thereby occasioned.

2. The complaint erroneously states that the govenment would pay 42.1% and O'Hara 57.9% of the cost of the vessel.

3. The record on appeal shows the date as February 3, 1971. This is apparently an erroneous date.

4. This figure represents 42.1% of $25,940.35 (see fn. 2). The refund which should have been sought is $10,428.02 which is 40.2% of the total sales tax paid.

Constitutional issues aside, the sales and use tax statute, 36 M.R.S.A. § 1760(2), contains express provision that

"No tax on sales, storage or use shall be collected upon or in connection with:

\* \* \* \* \* \*

". . . [s]ales to the State or any political subdivision, or to the Federal Government, or to any unincorporated agency or instrumentality of either of them or to any incorporated agency or instrumentality of them wholly owned by them."

The Justice in the Superior Court granting summary judgment in favor of the State Tax Assessor concluded

"that the sale of this vessel was not a sale to the United States of America, nor was the United States an owner of any part of the vessel."

█ It is readily apparent that by passage of the United States Fishing Fleet Improvement Act the Congress intended to give recognition to the economic importance of the United States fishing fleet and to upgrade the quality of such fleet by providing government subsidies. At the same time it was the clear intention of the Congress to create, through the use of subsidies for which provision was made in the Fleet Improvement Act, a standby or auxiliary fleet of vessels which were suitable for use by the military in time of war or national emergency.

The Act itself repeatedly uses the word "owner" to describe the fishing fleet operator for whose use the fishing vessel is built or remodeled.

Section 1408 of Title 46, as noted above, provides for the method of determining value of the vessel

"in the event the United States shall, through *purchase or requisition*, acquire *ownership* of any fishing vessel on which a construction subsidy was paid, . . . ." (Emphasis supplied).

█ Two conclusions stand out clearly to one reading the Fleet Improvement Act:

(1) That the grantee of the subsidy is the "citizen of the United States" who applies for and, when the conditions of 46 U. S.C.A. § 1402 are met, receives the "construction subsidy to aid in construction of a new vessel."

(2) That title to the vessel, or "ownership" of the vessel, is in the operator and remains with the operator unless and until the United States shall "through purchase or requisition" acquire ownership and thus divest the operator of his previously held title.

Also apparent from reading the contract together with the Fleet Improvement Act is that imposition of the sales tax results in an indirect increase in the amount of money which the United States government pays as a subsidy under the Act.

Is the increase in the amount of subsidy to be paid under the Act sufficient to invoke the immunity of the United States government[5] from State taxation?

The reasoning of the *McCulloch* court, the opinion of which was written by Chief Justice Marshall, was that

"the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the

5. The Constitution of the United States neither mentions nor alludes to immunity of the United States government. The limitation on the power of the State to impose a tax on the United States government or its agencies is implied. The doctrine of gov-

ernmental immunity from State taxation enunciated in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819) is deeply rooted in American jurisprudence. *See, Helvering v. Gerhardt*, 304 U.S. 405, 411, 58 S.Ct. 969, 82 L.Ed. 1427 (1938).

constitution has declared." *McCulloch v. Maryland,* supra, 17 U.S. at 436.

Chief Justice Marshall continued by declaring

" . . . 1st. that a power to create implies a power to preserve. 2nd. That a power to destroy, if wielded by a different hand, is hostile to, and incompatible with these powers to create and preserve." (p. 426)

The same reasoning was restated by Chief Justice Marshall five years after *McCulloch* in *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824).

Nearly a century of rigid application of the doctrine of federal immunity followed. *Dobbins v. Commissioners of Erie County,* 41 U.S. (16 Pet.) 435, 10 L.Ed. 1022 (1832); *Telegraph Co. v. Texas,* 105 U.S. 460, 26 L.Ed. 1067 (1882); *Williams v. Talladega,* 226 U.S. 404, 33 S.Ct. 116, 57 L.Ed. 275 (1912).

During the century the doctrine of federal immunity from State taxation was given rigid application. It was, in the words of Justice Frankfurter in *New York v. United States,* 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946),

"assumed that the economic burden of a tax on any interest derived from a government imposes a burden on that government so as to involve an interference by the taxing government with the functioning of the other government." 326 U.S. at 576, 66 S.Ct. at 311.

Finally, in *Panhandle Oil Co. v. Mississippi ex rel. Knox,* 277 U.S. 218, 48 S.Ct. 451, 72 L.Ed. 857 (1928), a strong dissent from Justice Holmes was registered. Later, Justices Brandeis and Cardozo dissented in a case in which the majority of the court concluded that *Panhandle Oil Co.* mandated the decision that a tax imposed by the State of Alabama on gasoline withdrawn from storage and sold to the Army and the Tennessee Valley Authority was unconstitutional. *Graves v. Texas Co.,* 298 U.S. 393, 56 S.Ct. 818, 80 L.Ed. 1236 (1936).

Ultimately, when the membership of the court changed a sales tax applied by the State of West Virginia to a contractor engaged in building locks and dams on behalf of the United States government was upheld as constitutional. *James v. Dravo Contracting Co.,* 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937).

The ultimate death blow to the economic burden concept of *McCulloch* came in two unanimous opinions—*Alabama v. King & Boozer,* 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3 (1941) and *Curry v. United States,* 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9 (1941)—in which *Panhandle Oil Co.,* supra, and *Graves v. Texas Co.,* supra, were expressly overruled to the extent that they held that a tax economically burdening the federal government was invalid.

■ Since *King & Boozer* the "legal incidence" test has been applied in place of the "economic burden" test. By this test, if the incidence of the State tax is directly on the United States or one of its instrumentalities, it is violative of the government's implied immunity; if the government is affected by the State tax only through the increased cost of services or materials, the tax is valid. *See, Powell, The Waning of Intergovernmental Tax Immunities,* 58 Harv.L.Rev. 633, 653 (1945). *See also, United States v. State Tax Commission of Mississippi,* 378 F. Supp. 558 (S.D.Miss.1974).

Our Court, in *W. S. Libbey Co. v. Johnson,* 148 Me. 410, 94 A.2d 907 (1953), construed the Maine Sales Tax Act to tax the retail seller and not the consumer.

The appellant has directed our attention to section 1753 of Title 36 which declares:

"The liability for, or the incidence of, the tax on tangible personal property provided by chapters 211 to 225 is declared to be a levy on the consumer."

Appellant also points to *State v. Keith*, 156 Me. 475, 166 A.2d 485 (1950), in which case the Court said:

"The sales tax is by statute made a tax upon the retailer, the incidence of which is made to fall upon the consumer." 156 Me. at 477, 166 A.2d at 486.

*Libbey Co. v. Johnson,* supra, is cited as authority for this statement.

The *Libbey* court reviewed the legislative history of the portion of the Act to which appellant points and declared it was clear that the legislative intention was that the sales tax was a tax imposed on the retailer and the *liability* for payment was *his* and *not the consumer's*.

■ That the "legal incidence" of the tax is on the retailer and that the "economic burden" is on the consumer is made clear by this language of the *Libbey* court:

"There can be no doubt that it was the retailer, and not the consumer, who was intended to be taxed by the Sales and Use Tax Law, as enacted in L.D. 1273, or that the retailer was vested with the limited right to pass the tax applicable to each particular sale along to his customer so far, and so far only, as the schedule of Section 5 permitted. The tax imposed upon a retailer, as Section 3 specifically declares, *'shall be in addition to all other taxes'* the retailer is required to pay." 148 Me. at 417, 94 A.2d at 910.

The Court went on to say:

"The *'incidence'* of all taxes, in final analysis, falls on the consumer, and it was clearly within the contemplation of the Legislature when L.D. 1273 was enacted that such part of the tax imposed by Section 3 as was added to selling prices under the schedule established by Section 5 was to be paid to retailers

making sales of tangible personal property by the purchasers thereof. That it was not contemplated that the exact amount of the tax should be so added was made apparent by authorizing the addition of the tax 'or *the average equivalent'* thereof, as well as by the closing provision of Section 5, that:

'Breakage under this section shall be retained by the retailer as compensation for the collection.'" 148 Me. at 418–419, 94 A.2d at 911.

While the United States Supreme Court has not always accepted the determination of the State court as to the legal incidence of a State tax [*see, First Agricultural National Bank v. State Tax Commissioner,* 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968)], that Court has, as recently as 1975, declared

". . . a State's highest court is the final judicial arbiter of the meaning of state statutes, . . ." *Gurley v. Rhoden,* 421 U.S. 200, 208, 95 S.Ct. 1605, 1610, 44 L.Ed.2d 110 (1975).[6]

In that case it was also said:

"The economic burden of taxes incident to the sale of merchandise is traditionally passed on to the purchasers of the merchandise. Therefore, the decision where the legal incidence of either tax falls is not determined by the fact that petitioner, by increasing his pump prices in the amounts of the taxes, shifted the economic burden of the taxes from himself to the purchaser-consumer. The Court has laid to rest doubts on that score raised by such decisions as *Panhandle Oil Co. v. Knox,* 277 U.S. 218, 48 S.Ct. 451, 72 L.Ed. 857, 56 ALR 583 (1928); *Indian Motorcycle Co. v. United States,* 283 U.S. 570, 51 S.Ct. 601, 75 L. Ed. 1277 (1931), and *Kern-Limerick v. Scurlock,* 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954), at least under taxing

6. *Cf., Mullaney v. Wilbur,* 414 U.S. 1139, 94 S.Ct. 889, 39 L.Ed.2d 96 (1974).

schemes, as here, where neither statute required petitioner to pass the tax on to the purchaser-consumer." 421 U.S. at 204, 95 S.Ct. at 1608.

■ We hold there is no constitutional impediment to the imposition of the Maine sales tax on this sale, the parties to which were appellant, the United States of America, and Dorothy M. O'Hara, Inc. The appellant's application for a refund was properly denied. This appeal avails appellant of nothing.

The entry must be:

Appeal denied.

WEATHERBEE, J., sat at argument and participated in consultation but died prior to preparation of opinion.

All Justices concurring.