

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-199-CV

AVIALL SERVICES, INC.                                             APPELLANT

V.

TARRANT APPRAISAL DISTRICT AND                                   APPELLEES
TARRANT APPRAISAL REVIEW BOARD

------------

FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

This appeal involves the interpretation of an ad valorem tax exemption. Appellant Aviall Services, Inc. appeals the trial court's grant of summary judgment in favor of Appellees Tarrant Appraisal District ("the District") and Tarrant Appraisal Review Board ("the Board"). Aviall's sole issue is whether aviation parts that it shipped to a federal enclave located within the geographical boundaries of Texas were transported "outside this State" for

purposes of the freeport ad valorem tax exemption as allowed by the Constitution of the State of Texas and enabling legislation.

## I. Factual and Procedural Background

### A. Aviall

The facts are undisputed. Aviall, one of the world's largest suppliers of aviation parts, located its central distribution center in Irving because both Dallas County and the Grapevine/Colleyville Independent School District allowed the freeport exemption. At its distribution center, Aviall imports, temporarily stores, and then ships aviation parts to various locations throughout the United States and other countries. One of the destinations to which Aviall ships inventory is the Red River Army Depot ("the Depot"), located in Bowie County near Texarkana, Texas.

### B. The Depot

In 1944, the Depot and its surrounding lands became a federal enclave under Article I, Section Eight, Clause Seventeen of the United States Constitution. This clause provides that Congress shall have the power "to exercise exclusive Legislation in all Cases whatsoever" over the District of Columbia and "to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the

2

Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful buildings." U.S. Const. art. I, § 8, cl. 17.

The then-governor of Texas signed two deeds ceding exclusive jurisdiction of more than 18,000 acres of land to the United States, with the reservation that the State of Texas retains concurrent jurisdiction only for service of civil and criminal process on the premises. The ceded land remains physically located within the geographic boundaries of Texas. *See Adams v. Calvert,* 396 S.W.2d 948, 949 (Tex. 1965) (recognizing federal enclave remains within geographic boundaries of State). The Depot currently remains under the exclusive jurisdiction and control of the United States.

## C. The shipments at issue

In 2006, Aviall filed an application for a "freeport exemption" with the District, seeking an exemption in the amount of $277,990,582 for freeport-eligible inventory shipped during 2005, including $27,486,322 for aircraft parts it had shipped to the Depot. Aviall shipped all of the inventory to the Depot within 175 days from the date it was imported into Texas. The District granted an exemption in the amount of $243,216,654 but denied the exemption for the parts shipped to the Depot. Aviall filed a notice of protest with the Board. After a hearing, the Board granted a higher exemption of $250,504,260 but

again denied the exemption for the parts shipped to the Depot in the amount of $27,486,322.

Aviall paid the tax under protest and filed suit on August 28, 2006, challenging the District and the Board's denial of the freeport exemption for the aircraft parts it had shipped to the Depot. Aviall moved for summary judgment, contending that the freeport exemption applied to its shipments of inventory to the Depot and arguing that, as a federal enclave, the Depot is considered "outside this State." The District and Board also filed a motion for summary judgment, arguing that Aviall's shipments of inventory to the Depot were not eligible for the freeport exemption because they were not transported outside the geographical boundaries of the state and, therefore, were not transported "outside this State" within the meaning of the freeport exemption's language in article VIII, section 1-j(a)(3) of the Texas constitution. The trial court denied Aviall's motion and granted the District and Board's motion. Aviall appeals from the final summary judgment.

## II.    The "Freeport Exemption"

Article VIII, section 1 of the Texas constitution provides, in pertinent part, that all real property and tangible personal property in this State, "unless exempt as required or permitted by this Constitution . . . shall be taxed in proportion to its value." Tex. Const. art. VIII, § 1(a), (b). In 1989, Texas

4

voters approved an amendment to the Texas constitution that exempted from ad valorem taxation personal property temporarily located in this State that is destined for out-of-State shipment and that is "transported outside this State" not later than 175 days after the date it is brought into or acquired in Texas.[1] *See generally* Tex. S.J. Res. 11 § 2(a), 71st Leg., R.S., 1989 Tex. Gen. Laws 6415, 6415–17.

Known as the "freeport exemption,"[2] the language of Texas constitution article VIII, section 1-j(a) reads, in pertinent part, as follows:

> To promote economic development in the State, goods, wares, merchandise, other tangible property, and ores, other than oil, natural gas, and other petroleum products, are exempt from ad valorem taxation if:
>
> (1) the property is acquired in or imported into this State to be forwarded *outside this State*, whether or not the intention to

---

[1] An earlier freeport exemption statute adopted without constitutional authorization was held valid only to the extent that it exempted property in interstate transit, i.e., for which there was no interruption in the continuity of transit other than necessary delay or accomodation. *See* Op. Tex. Att'y Gen. No. DM-463 (1997) (citing *Dallas County Appraisal Dist. v. Brinkman*, 701 S.W.2d 20, 23 (Tex. App.—Dallas 1985, writ ref'd n.r.e.); *see generally* Tex. Legis. Council, *Analyses of Proposed Constitutional Amendments*, *Nov. 7, 1989, Election* (Sept. 1989).

[2] Texas law was patterned after federal law on goods coming into United States ports and not taxed since they were "free" from a port or tax location. *See* Window on State Government, "2003 Annual Property Tax Report: Texas Taxing Units Levy $29 Billion in Local Property Taxes," (Nov. 2004), *available at* http://www.window.state.tx.us/taxinfo/proptax/stmt/stmt0411/.

forward the property outside this State is formed or the destination to which the property is forwarded is specified when the property is acquired in or imported into this State;

(2) the property is detained in this State for assembling, storing, manufacturing, processing, or fabricating purposes by the person who acquired or imported the property; and

(3) the property is transported *outside of this State* not later than 175 days after the date the person acquired or imported the property in this State.

Tex. Const. art. VIII, § 1-j(a)(1)–(3) (emphasis added).[3]

Chapter 11 of the Texas Tax Code is the enabling legislation for the amendment. Tex. Tax Code Ann. § 11.251 (Vernon 2008). The statute defines "freeport goods" as "property that under Article VIII, Section I-j of the Texas Constitution is not taxable" and provides that "a person is entitled to an exemption from taxation of the appraised value of that portion of the person's inventory or property consisting of freeport goods." *Id.* § 11.251(b). Local taxing jurisdictions may opt out of the freeport exemption and continue taxing otherwise exempt property. *See* Tex. S.J. Res. 11, § 2(b).

---

[3] For purposes of section 1-j, tangible personal property includes aircraft and aircraft parts, property affixed to an aircraft to be transported outside this State, and property, aircraft, or aircraft parts brought into this State and used for repair or maintenance of aircraft operated by a certified air carrier. *Id.* § 1-j (c).

**III. Standard of review**

We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Likewise, review of constitutional and statutory provisions involve matters of law and are reviewed de novo. *Harris County Hosp. Dist. v. Tomball Regional Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009). A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *see* Tex. R. Civ. P. 166a(b), (c).

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Valence Operating Co.*, 164 S.W.3d at 661. The reviewing court should render the judgment that the trial court should have rendered. *Id*.

**IV. Construing a constitutional provision**

In construing the Texas constitution, as in construing statutes, the guiding rule is to give effect to the intent of the makers and adopters of the

7

provision in question. *Harris County Hosp. Dist.*, 283 S.W.3d at 842; *City of El Paso v. El Paso Community College Dist*., 729 S.W.2d 296, 298 (Tex. 1986). We presume the language was carefully selected, and we interpret the words as they are generally understood. *Harris County Hosp. Dist.*, 283 S.W.3d at 842 (citing *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148 (Tex. 1995)).

When interpreting a constitution, we rely heavily on its literal text to give effect to its plain language. *Id.*; *Doody v. Ameriquest Mortgage Co.*, 49 S.W.3d 342, 344 (Tex. 2001). We use the same guidelines used in construing statutes to construe constitutional provisions. *See, e.g., Meador v. EMC Mortgage Corp.*, 236 S.W.3d 451, 452 (Tex. App.—Amarillo 2007, pet. denied).

Under the plain meaning rule, if a provision is clear and unambiguous, resorting to extrinsic aids and rules of construction is inappropriate, and the provision should be given its common everyday meaning. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008); *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). This rule provides an objective guidepost to the legislature's intent and ensures ordinary citizens are able to "rely on the plain language . . . to mean what it says." *Fitzgerald v. Advanced Spine Fixation Sys., Inc*., 996 S.W.2d 864, 866 (Tex. 1999). In applying the plain meaning,

we may not by implication enlarge the meaning of any word in a provision beyond its ordinary meaning when intent as to the meaning may be gathered from a reasonable interpretation of the provision as it is written. *Stringer v. Cendant Mortgage Corp.*, 23 S.W.3d 353, 354 (Tex. 2000).

**V.    Analysis**

Aviall contends that, because neither the Texas constitution nor the enabling statute limits the exemption to inventory shipped outside the geographical limits of this State, a shipping destination "outside this State" includes a federal enclave as a destination beyond the limits of the jurisdiction, sovereignty, legislation, or control of Texas — even though it remains located within the geographic boundaries of Texas. The District and Board respond that the constitutional provision and statute must be given their ordinary meaning, referring only to the geographic limits of this State, and that terms such as "outside of this State's jurisdiction" or "beyond the limits of the sovereignty, legislation or control" of Texas are not contained in the language of the freeport exemption and, therefore, cannot be supplied by implication. *See* Tex. Const. art. VIII, § 1-j(a)(1)–(3).

The term "State" is not defined either in the constitutional amendment or in the tax code. Aviall advocates a "broad" interpretation of that term to include jurisdictional, legislative, and sovereign power in addition to

9

geographical borders. Aviall points out that federal enclaves are created under the clause that empowers Congress to "exercise exclusive legislation" over property that a state voluntarily cedes to the federal government, meaning that there is an "actual transfer of sovereignty." *See Vincent v. Gen. Dynamics Corp.*, 427 F. Supp. 786, 795 (N.D. Tex. 1977). Relying upon *Paul v. United States*, 371 U.S. 245, 263, 83 S. Ct. 426, 437 (1963), Aviall further maintains that, absent specific congressional authorization, a state cannot regulate activities or property within a federal enclave.

The phrase "outside this State" in the context of the exemption from the ad valorem tax refers to location, not jurisdiction or power. This case does not involve the State's power to exercise jurisdiction or legislation over the property or residents of the Depot. Nor are the District and taxing entities attempting to assess taxes on property within the federal enclave that constitutes the Depot. Those aspects of a "state" within the federal system of these United States are not implicated. The tax is assessed solely on inventory while it is located on Aviall's private property at its distribution center in Irving, Texas. *See* Tex. Tax Code Ann. §§ 11.01, 23.01, 32.01 (Vernon 2008).

Moreover, Aviall's interpretation would reverse the long-standing rule to strictly construe tax exemptions against the taxpayer. *See River Oaks Garden Club v. City of Houston*, 370 S.W.2d 851, 854 (Tex. 1963); *ICAN Enter., Inc.*

10

*v. Williamson County Appraisal Dist.*, No. 03-06-00594, 2009 WL 1025084, *3 (Tex. App.—Austin April 17, 2009, pet. denied) (holding trial court properly gave narrow interpretation for exemption for stored aircraft parts, denying taxpayer's application for its storage of entire aircraft).  It is well settled that language granting exemptions from taxation are not favored and must be strictly and narrowly construed against the taxpayer. *N. Alamo Water Supply Corp. v. Willacy County Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex. 1991); *Davies v. Meyer,* 541 S.W.2d 827, 829 (Tex. 1976); *Am. Hous. Found. v. Harris County Appraisal Dist.*, 283 S.W.3d 76, 80 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 872 (Tex. App.—Austin 2002, pet. denied).  Exemptions are subject to strict construction because they undermine the goal of equality and uniformity by placing a greater burden on some taxpaying businesses and individuals rather than placing the burden on all taxpayers equally. *N. Alamo Water Supply Corp.*, 804 S.W.2d at 899; *Bullock v. Nat'l Bancshares Corp.*, 584 S.W.2d 268, 271–72 (Tex. 1979), *cert. denied*, 444 U.S. 1016 (1980).

Additionally, an exemption cannot be raised by implication but must affirmatively appear, and all doubts are resolved in favor of the taxing authority and against the taxpayer. *Bullock*, 584 S.W.2d at 272.  Thus, the burden of

11

proof of "clearly showing" that an exemption applies is on the taxpayer, with all doubts resolved against the taxpayer. *N. Alamo Water Supply Corp.*, 804 S.W.2d at 899 (citing *Bullock*, 584 S.W.2d at 272).

Considering the plain meaning of the clause's terms in light of the rules of strict construction for tax exemptions, we cannot interpret the freeport exemption in a broad manner by implying additional language that would exempt Aviall's shipments to the Depot. *See id.*; *see also Leland v. Brandal*, 257 S.W.3d 204, 205 (Tex. 2008) (stating that court may not judicially amend statute by adding words not contained in the statutory language). We are not free to enlarge or judicially amend the constitutional amendment or enabling statute. *Leland*, 257 S.W.3d at 205. This is particularly so because Aviall urges an interpretation of the constitutional exemption based on a fiction.

Aviall relies upon *United States v. State Tax Commission of Mississippi*, 412 U.S. 363, 378, 93 S. Ct. 2183, 2192 (1973), for a novel argument that the concept of a "federal island" or a "state within a state" requires that we interpret the exemption in such a manner that transportation of the aviation parts to the Depot—as a federal enclave—is "outside this State," even though the Depot is located within Texas. But we agree with the District and Board that this "state within a state" fiction advocated by Aviall has no application here.

12

In *State Tax Commission of Mississippi,* Mississippi attempted to regulate wholesale distribution of alcohol by making the State Tax Commission the exclusive importer and wholesaler of alcoholic beverages within that State. *Id*. at 412 U.S. at 364, 93 S. Ct. at 2185. The Commission adopted a regulation purporting to impose a markup, essentially a sales tax, on liquor purchased directly from out-of-state suppliers by post exchanges, officer's clubs, and ship's stores on four military bases located geographically within the State. *Id.* at 366, 93 S. Ct. at 2186. Two of the four military bases were federal enclaves. Mississippi contended that the Twenty-First Amendment to the Constitution permitted it to regulate "transportation or importation [of liquor] into [the] State . . . for delivery or use therein." *Id*. at 367, 373, 93 S. Ct. at 2186, 2190. The United States argued that the regulation as to those bases interfered with its exclusive jurisdiction conferred by Article I, Section Eight, Clause Seventeen of the Constitution.[4] *Id.* at 369, 93 S. Ct. at 2187–88. Agreeing with the United States, the Supreme Court reasoned that the transactions on which the markup was sought to be imposed were strictly between the out-of-state suppliers and the military facilities, involving goods delivered within the military bases, and nothing occurred within the State that

---

[4] The other two bases were within the concurrent jurisdiction of the state and federal governments. *Id.*

13

gave it jurisdiction to regulate the transaction. *Id*. at 371, 93 S. Ct. at 2189. Thus, the Court held, the transactions did not involve "transportation or importation into [the] State . . . for delivery or use thereof," but only importation of liquor into the federal enclaves, "which 'are to Mississippi as the territory of one of her sister states or a foreign land.'" *Id.* at 375, 378, 93 S. Ct. at 2191, 2192 (quoting *United States v. State Tax Comm'n of Miss.*, 340 F. Supp. 903, 906 (S.D. Miss. 1972)).

Aviall argues that, if liquor shipped from outside a state to a federal enclave located geographically within a state has *not* been "transport[ed] or import[ed] *into* [t]he State" within the meaning of the Twenty-First Amendment, then it necessarily follows that the liquor must have been transported *outside* the state. Even if we accept this reasoning as to the liquor in *State Tax Commission of Mississippi,* the case is distinguishable because, as pointed out by the opinion in that case, Mississippi's attempt to regulate imported alcohol within the federal enclave in that case *interfered with federal jurisdiction*, requiring a distinction to be made in the relationship between the two territories. No one in this case contends the ad valorem tax on Aviall's inventory while at Aviall's distribution center interferes with federal jurisdiction. Because of this distinction, other cases from the Supreme Court provide clearer

14

guidance regarding the federal enclave and state relationship and the "state within a state" argument.

Specifically, in *Howard v. Commissioners of Sinking Fund of City of Louisville*, the Supreme Court held that a naval ordnance plant that had been acquired by the United States and over which the United States exercised exclusive jurisdiction could nevertheless be subsequently annexed by the City of Louisville because, although the federal government had exclusive jurisdiction within the ordnance plant, "*[t]he property did not cease to be a part of Kentucky. The geographical structure of Kentucky remained the same*." 344 U.S. 624, 626, 73 S. Ct. 465, 466 (1953) (emphasis added). The Court reasoned that including the enclave within the city's boundaries did not affect the use or disposition of the property by the United States, stating that the "[f]iction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, *so long as there is no interference with the jurisdiction* asserted by the Federal Government." *Id*. at 626–27, 73 S. Ct. at 467 (emphasis added). The Court observed that the sovereign rights in the dual relationship between the United States and Kentucky were not antagonistic in that instance, so that it is "friction, not fiction, which we must give heed." *Id.* at 627, 73 S. Ct. at 467; *see also Evans v. Cornman*, 398 U.S. 419, 423, 90 S. Ct. 1752, 1755 (1970) (rejecting

15

notion of non-residency in state for voting in Maryland elections by those residing in a federal enclave and noting that "the relationship between federal enclaves and the [s]tate in which they are located has changed considerably"); *M.R.S. v. State,* 745 So. 2d 1139, 1140 (Fla. Dist. Ct. App. 1999) (recognizing *Howard* holding that "fiction of a state within a state" has no validity to prevent exercise of power by state over federal area within its boundaries, so long as there is no interference with federal jurisdiction); *Cobb v. Cobb*, 545 N.E.2d 1161, 1163 (Mass. 1989) (stating state courts have recognized state law may apply in a federal reservation provided the state does not interfere with the primary jurisdiction of the federal government); *Matter of Salem Transp. Co.*, 264 A.2d 47, 49 (N.J. 1970) (per curiam) (permitting regulation of transportation services to and from military bases); *cf. Common Council of Gloversville v. Town Bd. of Johnstown*, 295 N.E.2d 644, 645–46 (N.Y. 1973) (upholding annexation of state-owned land by townships).[5]  Just as the

---

[5] The Supreme Court has held that states can regulate and maintain control over certain activities on federal enclaves, including the right to vote for enclave residents in state-wide elections.  *See Evans*, 398 U.S. at 422, 90 S. Ct. at 1754.  Thus, states like Texas have the ability to regulate voting within its own federal enclaves, but not with other states in the union.  *See, e.g.,* Tex. Const. art. VI, § 2 (requiring voters to be residents of the state of Texas); Okla. Const. art. III, § 1 (requiring voters to be "bona fide residents" of the state of Oklahoma).

ordnance plant did not cease to be a part of Kentucky, the Depot in this case did not cease to be a part of Texas.

We further note that the Supreme Court made a distinction in *State Tax Commission of Mississippi* between the State's attempt to regulate transactions occurring solely within the federal enclaves of the military bases, which the Court determined to be impermissible, and the authority of the State to regulate shipments destined for such bases while those shipments were passing through Mississippi. 412 U.S. at 377, 93 S. Ct. at 2192. The distinction seems appropriate here.

The District determined, and the Board agreed, that Aviall was not exempt from paying taxes on the inventory temporarily located in Texas that was later shipped to the Depot. The taxing entities did not attempt to interfere with federal jurisdiction by assessing a tax on a transaction occurring on federally-owned property nor on property located within the federal enclave; rather, the District and the Board denied the tax exemption claimed by Aviall on property while it was in Texas. Unlike the liquor markup in *State Tax Commission of Mississippi*, there was no interference with federal jurisdiction by the taxing entities; hence, no friction. Therefore, we will not apply the fiction that the Depot was a foreign country or a sister state to deem that the aviation parts were shipped by Aviall "outside the State" when they were

17

shipped to a location in Bowie County near Texarkana, within the geographic limits of Texas.

Aviall also argues that the purpose, history, and context of the freeport exemption support the broad interpretation it urges. Aviall points to the legislative history of the constitutional amendment that was submitted to voters as "promoting the economic growth, job creation, and fair tax treatment for Texans who export goods to other states and nations." *See* Tex. S.J. Res. 11. To promote the amendment, the legislature also noted that "[t]ax incentives have been an important part of Texas' successful effort to attract several major industrial, technological and transportation facilities in recent years, and the freeport exemption would be a valuable addition to Texas' arsenal in the battle to diversify the state's economy." Tex. Legis. Council, *Analyses of Proposed Constitutional Amendments, Nov. 7, 1989, Election*.

Mindful of the enticements that the exemption provides to companies like Aviall to locate their warehouses and distribution centers in this State, when construing statutes, we must presume that public interests are favored over private interests. *See* Tex. Gov't Code Ann. § 311.021(5); *City of DeSoto v. White*, 288 S.W.3d 389, 396–97 (Tex. 2009). It is in the public interest that the ad valorem tax be applied to property owners to compensate for a variety of benefits provided by local services such as fire and police protection, street

18

lighting, roads and streets, and other incidents of a modern industrial infrastructure. *Virginia Indonesia v. Harris County Appraisal Dist.*, 910 S.W.2d 905, 909 (Tex. 1995) (citing *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 289, 96 S. Ct. 535, 548 (1976)); *see also Exxon Corp. v. Wisconsin Dept of Rev.*, 447 U.S. 207, 228, 100 S. Ct. 2109, 2122 (1980) (holding tax must be fairly related to services provided by state, including police and fire protection and benefit of trained work force). Additionally, as the Supreme Court has held, exemptions undermine equality and uniformity by placing a greater burden on some taxpaying businesses and individuals rather than on all taxpayers equally. *N. Alamo Water Supply Corp*., 804 S.W.2d at 899. The public interest weighs against the broad construction urged by Aviall and in favor of a strict construction of the freeport exemption.

Finally, Aviall argues that taxing inventory that it later ships to the Depot on the basis that it is not "transported outside the State" will increase the cost of aviation parts sold to the United States. Aviall did not raise this issue in its original brief or in its motion for summary judgment. Nevertheless, it is well settled that private parties who contract with and do business with the United States can be taxed even though the increased financial burden will ultimately fall on the United States. *See, e.g., South Carolina v. Baker*, 485 U.S. 505, 520, 108 S. Ct. 1355, 1365 (1988); *United States v. New Mexico*, 455 U.S.

19

720, 733–35, 102 S. Ct. 1373, 1382–83 (1982); *James v. Dravo Contracting Co.*, 302 U.S. 134, 160–61, 58 S. Ct. 208, 221 (1937).

**VI.    Conclusion**

We decline to adopt Aviall's broad interpretation of the freeport exemption.    We hold that Aviall's inventory shipped to the Depot, geographically located within this State, was not transported "outside this State" under the plain language of the freeport exemption.  We conclude that the Board and the District were entitled to summary judgment as a matter of law on the ground that the freeport exemption's phrase "outside this State" does not include the Depot, located wholly within the boundaries of the state of Texas.  We hold that Aviall's aircraft shipment to the Depot was not entitled to the freeport exemption under article VIII, section 1-j(a)(1)–(3) of the Texas constitution and section 11.251 of the tax code.  We overrule Aviall's sole issue and affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

DELIVERED:  October 29, 2009

20